EDWARD K. LEE (SBN 294954)
elee@loeb.com
JONATHAN ZAVIN (*pro hac vice*)
jzavin@loeb.com
JONATHAN NEIL STRAUSS (*pro hac vice*)
jstrauss@loeb.com
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: 310.282.2000
Facsimile: 310.282.2200

Attorneys for Defendants
FOX SEARCHLIGHT PICTURES,
INC., TWENTIETH CENTURY
FOX FILM CORPORATION, TSG
ENTERTAINMENT FINANCE,
LLC, GUILLERMO DEL TORO and
DANIEL KRAUS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ZINDEL, as Trustee for the David Zindel Trust and the Lizabeth Zindel Trust,<br><br>   Plaintiff,<br><br>   v.<br><br>FOX SEARCHLIGHT PICTURES, INC., a Delaware corporation, TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation, TSG ENTERTAINMENT FINANCE LLC, a Delaware limited liability company; MACMILLAN PUBLISHERS, LTD., a subsidiary of a German limited liability company; GUILLERMO DEL TORO, an individual; DANIEL KRAUS, an individual; and DOES 1 through 10, inclusive,<br><br>   Defendants. | Case No.: 2:18-cv-01435-PA-KSx<br><br>Assigned to Hon.: Percy Anderson<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE FILM DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AND JOINDER IN MOTION TO DISMISS FILED BY DEFENDANT MACMILLAN PUBLISHING GROUP, LLC**<br><br>*[Concurrently filed: Notice of Motion; Declaration of Jonathan Neil Strauss; Notice of Lodging of Exhibit; Request for Judicial Notice; [Proposed] Order Granting Motion; and [Proposed] Order re Request for Judicial Notice.]*<br><br>Date: June 25, 2018<br>Time: 1:30 pm<br>Place: Courtroom 9A<br><br>Complaint Filed: February 21, 2018 |

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

# TABLES OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES...........................................1

I.    INTRODUCTION ..................................................................................1

II.   STATEMENT OF FACTS........................................................................2

    A.    Plaintiff's Play, Let Me Hear You Whisper ........................................3

        1.    The Originally-Registered Scholastic Version ...........................3

        2.    The Newly-Registered, All-Female Version ..............................5

    B.    Defendants' Film, The Shape of Water .................................................6

III.  PLAINTIFF CANNOT STATE AN INFRINGEMENT CLAIM ...............10

    A.    To State a Claim, Plaintiff Must Demonstrate "Substantial Similarity" Between the Works' Protected Elements.........................10

    B.    The Court Can Compare the Works and Determine Lack of Substantial Similarity as a Matter of Law on a Motion to Dismiss ...............................................................................................12

    C.    Applying the Extrinsic Test, There is No "Substantial Similarity" Between The Play and The Shape of Water, as a Matter of Law.....................................................................................13

IV.   CONCLUSION ......................................................................................25

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

i

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Cases**

4

*A&M Records, Inc. v. Napster, Inc.*,
5
   239 F.3d 1004 (9th Cir. 2001) ............................................................................ 27

6

*Abdullah v. Walt Disney Co.*,
7
   No. 2:15-cv-09581-SVW-JPR, 2016 WL 5380930
   (C.D. Cal. Mar. 14, 2016) ............................................................................... 15

8

*Astor-White v. Strong*,
9
   No. CV 15-6326 PA, 2016 U.S. Dist. LEXIS 40608
10
   (C.D. Cal. Mar. 28, 2016) ................................................................ 15, 18, 20

11

*Benay v. Warner Bros. Entm't, Inc.*,
12
   607 F.3d 620 (9th Cir. 2010) ..................................................................*passim*

13

*Berkic v. Crichton*,
14
   761 F.2d 1289 (9th Cir. 1985) ...................................................................... 14, 18

15

*Bernal v. Paradigm Talent & Literary Agency*,
   788 F. Supp. 2d 1043 (C.D. Cal. 2010) ........................................................ 24
16

17

*Buggs v. Dreamworks, Inc.*,
   No. CV 09-07070 SJO, 2010 U.S. Dist. LEXIS 141515
18
   (C.D. Cal. Dec. 28, 2010) ............................................................................... 18

19

*Campbell v. Walt Disney Co.*,
20
   718 F. Supp. 2d 1108 (N.D. Cal. 2010) ........................................................ 18

21

*Cavalier v. Random House, Inc.*,
22
   297 F.3d 815 (9th Cir. 2002) ................................................................ 14, 18, 27

23

*Crane v. Poetic Prods. Ltd.*,
   593 F. Supp. 2d 585 (S.D.N.Y. 2009) .......................................................... 15
24

25

*DC Comics v. Towle*,
   802 F.3d 1012 (9th Cir. 2015) ....................................................................... 20
26

27

*Dean v. Cameron*,
   53 F. Supp. 3d 641, 647 (S.D.N.Y. 2014) .................................................... 23

28

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

i

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

## TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

*Doody v. Penguin Grp. (USA) Inc.*,
   673 F. Supp. 2d 1144 (D. Haw. 2009) ................................................................23

*Esplanade Prods. v. Walt Disney Co.*,
   No. CV 17-02185-MWF, 2017 U.S. Dist. LEXIS 217700
   (C.D. Cal. Nov. 8, 2017) .............................................................13, 14, 15, 24

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ...........................................................................5

*Flaherty v. Filardi*,
   No. 03 Civ. 2167 (LTS) (HBP), 2009 U.S. Dist. LEXIS 22641
   (S.D.N.Y. Mar. 20, 2009) ................................................................................21

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
   462 F.3d 1072 (9th Cir. 2006) ...............................................................*passim*

*Gallagher v. Lions Gate Entm't, Inc.*,
   No. 2:15-cv-02739-ODW (Ex), 2015 U.S. Dist. LEXIS 122441
   (C.D. Cal. Sept. 11, 2015) ......................................................................*passim*

*Johnson v. Knoller*,
   No. CV 16-7761-R, 2017 U.S. Dist. LEXIS 217782
   (C.D. Cal. Sept. 18, 2017) ................................................................................23

*Kouf v. Walt Disney Pictures & Television*,
   16 F.3d 1042 (9th Cir. 1994) ...........................................................................27

*Litchfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) .........................................................................27

*Nat'l Comics Publ'ns, Inc. v. Fawcett Publ'ns, Inc.*,
   198 F.2d 927 (2d Cir. 1952) ............................................................................23

*Newt v. Twentieth Century Fox Film Corp.*,
   No. 15-CV-02778-CBM-JPRx, 2016 U.S. Dist. LEXIS 98308
   (C.D. Cal. July 27, 2016).................................................................................15

*Olson v. NBC*,
   855 F.2d 1446 (9th Cir. 1988) .........................................................................24

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

ii

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

## TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
  602 F.3d 57 (2d Cir. 2010) ................................................................... 15

*RDF Media Ltd. v. Fox Broad. Co.*,
  372 F. Supp. 2d 556 (C.D. Cal. 2005) ................................................. 15

*Rentmeester v. Nike, Inc.*,
  883 F.3d 1111 (9th Cir. 2018) ....................................................... 13, 14

*Rice v. Fox Broad. Co.*,
  330 F.3d 1170 (9th Cir. 2003) ............................................................ 23

*Schkeiban v. Cameron*,
  No. CV 12-0636-R, 2012 U.S. Dist. LEXIS 145384
  (C.D. Cal. Oct. 4, 2012), *aff'd*, 566 F. App'x 616 (9th Cir. 2014) ...................... 26

*Schwarz v. United States*,
  234 F.3d 428 (9th Cir. 2000) .............................................................. 15

*Shame on You Prods. v. Banks*,
  120 F. Supp. 3d 1123 (C.D. Cal. 2015) ..................................... 13, 15, 18

*Silas v. HBO*, 201 F. Supp. 3d 1158
  (C.D. Cal. 2016), *aff'd*, 713 F. App'x 626 (9th Cir. 2018) ............................ 5, 25

*Silas v. HBO*,
  713 F. App'x 626 (9th Cir. 2018) ................................................ 12, 14, 15

*Survivor Prods. v. Fox Broad. Co.*,
  No. CV01-3234 LGB, 2001 U.S. Dist. LEXIS 25512
  (C.D. Cal. June 12, 2001) .................................................................. 15

*White v. Twentieth Century Fox Corp.*,
  572 F. App'x 475 (9th Cir. 2014) ............................................... 12, 13, 15

*Zella v. E.W. Scripps Co.*,
  529 F. Supp. 2d 1124 (C.D. Cal. 2007) ..................................... 5, 12, 14

**Other Authorities**

https://en.wikipedia.org/wiki/E.T._the_Extra-Terrestrial ......................... 17

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

iii

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

# TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

https://en.wikipedia.org/wiki/Free_Willy ................................................................. 17

https://en.wikipedia.org/wiki/Project_X_(1987_film) ............................................. 17

https://en.wikipedia.org/wiki/Splash_(film) ............................................................ 17

https://en.wikipedia.org/wiki/Starman_(film) ......................................................... 17

https://en.wikipedia.org/wiki/The_Day_of_the_Dolphin_(book ............................ 17

https://www.imdb.com/title/tt1417793/fullcredits?ref_=tt_cl_sm#cast ................... 22

https://www.imdb.com/title/tt0248152/fullcredits?ref_=tt_cl_sm#cast ................... 22

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

*The Shape of Water* (the "Film"), a complex mixture of adult fairy tale, love story, thriller, musical comedy and melodrama directed and co-written by Guillermo del Toro, has received universal critical acclaim.   The   Film was nominated for thirteen Oscars this year (more than any other film), winning four—including Best Picture and Best Director.[1]

On the eve of the Academy Awards voting period (presumably when plaintiff and his attorney felt that their leverage was strongest) plaintiff David Zindel filed a specious complaint alleging that the Film infringes the copyright in   *Let Me Hear You Whisper* (the "Play"), a short two-act play written by his father, which was originally published in 1970 in a classroom magazine for students, Scholastic Voice.

However, when the Court watches the Film and reads the Play it will see that the works are completely dissimilar, and that there is no legally cognizable "substantial similarity" between the two.   The Play is a short, straightforward, essentially three-person play about the evils of animal experimentation, in which a reserved cleaning woman in a small laboratory convinces a dolphin to talk, thus preventing it from being killed by scientists, then quits her job and leaves the dolphin behind.   The Film, by contrast, is a sweeping, and decidedly adult, meld of genres, about a romantic, and sexual, relationship between Elisa, a mute but vibrant female janitor, and a humanoid, amphibian creature with godlike, magical powers. Elisa is ultimately revealed to be not-quite-human after all, but rather her own form of aquatic being; in the end Elisa and the creature escape together and live happily ever after, under the water.   The Film contains numerous other major characters, subplots and themes that bear no resemblance to the Play, including a monstrous

---

[1] This motion to dismiss is filed on behalf of various defendants involved in the creation and financing of the Film: Fox Searchlight Pictures, Inc., Twentieth Century Fox Film Corporation, TSG Entertainment Finance LLC, Guillermo del Toro and Daniel Kraus (collectively, the "Film Defendants").

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

1

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

villain who hunts the creature and attempts to kill both the creature and Elisa; Russian spies; Elisa's close friends, who aid her in rescuing the creature and have their own storylines and internal lives; and the love and redemptive power of cinema and music.  In every relevant measure, the works are entirely different.

Any "similarity" between these vastly different works derives from the non-protectible idea of a relationship between a person and an animal (in the case of the Play) or mythical humanoid creature (in the case of the Film) that scientists wish to kill and/or study and experiment on—an idea that has previously been the subject of numerous films, including *Free Willy, Starman, Splash!, Project X,* and *E.T. the Extra-Terrestrial*.  As a matter of law, such alleged similarities in basic plot ideas or concepts, cannot give rise to an infringement claim, and review of the works reveals that their respective treatments of this unprotectable concept is totally dissimilar.

Plaintiff attempts to avoid this reality by cobbling together a list of supposed "similarities" between the works, even though courts in this Circuit have repeatedly held that such self-serving lists are inherently unreliable and cannot support an infringement claim.  The Court's review of the works will show that Plaintiff's "list" is embarrassingly inaccurate, misleading, and based on gross misrepresentations.

Courts in this District have not hesitated to dismiss copyright claims at the pleading stage in these circumstances.  Indeed, in just the last few months the Ninth Circuit has twice confirmed that a court can, and should, dismiss infringement claims at the pleading stage, where, as here, review of the works themselves (rather than the plaintiff's self-serving allegations) demonstrates no legally cognizable "substantial similarity" as a matter of law.  No amount of discovery can change the content of the works.  The Complaint should be dismissed now, with prejudice.

## II.    STATEMENT OF FACTS

The facts herein are taken from the Complaint and documents incorporated by reference therein, including the Play and the Film.  The Court can, and under the law should, read and view the subject works for itself, and will inevitably see the lack of

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

2

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

similarity; these summaries are provided solely for the Court's convenience. [2]

### A.   Plaintiff's Play, *Let Me Hear You Whisper*

#### 1.   The Originally-Registered Scholastic Version

The Play, written in 1969, was first published in 1970 in a magazine for students, Scholastic Voice, and was registered with the U.S. Copyright Office on May 22, 1970.  (Compl. ¶¶ 23, 28 and Compl. Ex. A).

The Play is a two-act work about the evils of animal experimentation.  It is set entirely in the offices of the American Biological Association Development for the Advancement of Brain Analysis ("ABADABA"), a research lab in New York City that experiments on the brains of animals.  The Play opens with Miss Moray, a "briskly efficient supervisor," giving an orientation tour to Helen, a cleaning lady who has just been hired to scrub the floors.[3]  Helen is reserved, tersely responding to Moray's inquiries with clipped sentences.  (Play at 8-9).  Helen and Moray enter the lab, where they meet Dan, a dim, talkative night porter, and Helen sees a dolphin, which is kept in a small, "cramped" tank.  Before leaving Helen to her work, Moray comments "Oh, Helen, I know you're going to fit right in with our little family. You're such a *nice* person."   Throughout the Play Moray makes similarly condescending comments regarding Helen's "niceness" and simplicity; her faux-kindness is used as a means of controlling Helen's behavior.  (*Id.* at 9, 12, 16, 19).

As Helen cleans, a record begins to play:  "Let me call you sweetheart, I'm in love with you.  Let me hear you whisper that you love me, too.  (*Id.* at 9).  The dolphin rises to the surface, and utters the sound "Youuuuuu" through its blowhole.

---

[2] *See Fecht v. Price Co.*, 70 F.3d 1078, 1080 n.1 (9th Cir. 1995) ("[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.").  Thus, it is well-settled that a court a considering a motion to dismiss a copyright infringement claim  may consider the content of the works at issue.  *See, e.g., Silas v. HBO*, 201 F. Supp. 3d 1158, 1168-69 (C.D. Cal. 2016), *aff'd*, 713 F. App'x 626 (9th Cir. 2018); *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1128 (C.D. Cal. 2007).

[3] The originally-registered version of the Play, initially published in Scholastic Voice, is annexed as Exhibit 1 to the accompanying Declaration of Jonathan Strauss ("Strauss Declaration").  Citations to "Play" are to Exhibit 1 to the Strauss Declaration.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

3

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

Dan later arrives, and tells Helen that the scientists are "tryin' to get [the dolphin] to talk," but that it had not learned a single word—even though the scientists had been playing the record every seven minutes, for months.  (*Id.* at 9-12).

The next evening Helen tries to get the dolphin to talk again; Moray, who had been eavesdropping, warns Helen against becoming attached to the  lab animals, which are all experimented on (and often killed), and explains that "[e]very laboratory in the country is doing this type of work.  It's quite accepted."  After Moray leaves, the dolphin says "Whisper to me." (*Id.* at 12-16).

The following evening Helen pets the dolphin, which says  "Hear me." Moray interrupts and informs Helen that the dolphin will be killed on Friday.  Dan enters and says he is "[g]onna sharpen the handsaws now.  Won't have any trouble getting through the skull on this one, no sir."  Helen, upset, asks if the dolphin is going to be killed merely because it did not speak.  Moray cautions Helen to know her place:  "[W]e have no right to endanger the genius about us."  The first act ends with the dolphin saying "Help….  Please help me."  (*Id.* at 16).

Act II takes place the night that the dolphin is to be "dissected."  Helen again meekly expresses her protests to Moray, saying "[m]aybe he's a mute …. Just because [some human beings] can't talk we don't kill them."  Helen enters the lab, where the dolphin again says "Help me."  Helen tells the dolphin that it does not need her help, and that it should just say something to the scientists to save its own life.  She decides to tell the scientists that she heard the dolphin speak, but the dolphin tells her "Nooooooo," and then says "Plaaaaaan." (*Id.* at 16).

Helen asks Dan if he knows about a "plan," and Dan tells her that the scientists often write in an "experiment book," which he retrieves.  Before Helen can read the book she is interrupted by Moray; Helen asks why the scientists want to teach the dolphin to talk, and Moray explains that communicating with dolphins could lead to numerous advances for humankind.  Convinced by Moray's speech, Helen becomes angry with the dolphin, accusing it of being "lazy" and "selfish,"

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

4

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

and more willing to die than to help humans.  The dolphin repeatedly says "Boooook!"  Helen finally reads the experiment book, learns of "military implications" of communicating with dolphins, and realizes that the dolphin refuses to speak because it does not wish to be used as a tool for war.  (*Id.* at 16-17).

The dolphin then says "Hamm … purrr."  Helen is uncomprehending until, after speaking to Dan, she finally realizes that the dolphin is telling her to help it get away by putting it in a hamper and wheeling it out to sea.  But no sooner does she get her arms around the dolphin's torso than Moray catches her in the act, and fires her after giving one last condescending speech about knowing one's place:

> You really are a nice person, Helen….  But to be simple and nice in a world where great minds are giant-stepping the micro-and macro-cosms, well—one would expect you'd have the humility to yield in unquestioning awe.

(*Id.* at 17-19).   The record again begins to play, and Helen musters her courage, charging into the lab where the scientists are preparing to kill the dolphin.  She calls the scientists a "pack of killers," and gives a speech summarizing the Play's themes, saying that "being nice isn't any good" and that people need to "speak up against what's wrong," and decrying the evils of animal experimentation.  Helen yells at the dolphin, calling it a "coward."  Finally the dolphin speaks in front of the scientists, saying "love"—Helen pats it on the head and exits.  The scientists realize that Helen had something to do with the dolphin speaking, and tell Moray to retrieve her.  Moray apologizes to Helen and begs her to stay, but Helen slams the door in Moray's face, ending the play.  (*Id.* at 19-22).

## 2.   The Newly-Registered, All-Female Version

Just days prior to filing his Complaint, Plaintiff filed an application with the U.S. Copyright Office to register what Plaintiff describes as an "unabridged" version of the Play, which was first published in 1973 by Dramatists Play Service, Inc. ("DPS").  (Compl. ¶¶ 23, 29).[4]  Other than minor additions in dialogue and set

---

[4] The DPS version of the Play is annexed as Exhibit 2 to the Strauss Declaration.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

5

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

direction, the DPS version of the Play is identical to the originally-registered version in all material respects, except in the DPS version all five characters—Helen, Moray, the dim night porter (renamed "Danielle" from "Dan") and the two scientists (minor characters who were portrayed as men in the original version)—are now women, presumably to accommodate a school production involving an all-female cast.   (*See, e.g.,* Strauss Decl. Ex. 2 at 4).   While the genders of these three secondary characters are flipped, there is no change in their characterizations.

### B.   Defendants' Film, *The Shape of Water*

The Film opens with a fantastical underwater scene, as the camera flows through what at first appears to be a natural rock formation, which opens into an undersea hallway, through a door, and finally into an apartment, where chairs and tables float among the fish.   A narrator (Giles), ponders how to explain the story that follows, which he describes as a "tale of love and loss, and the monster who tried to destroy it all."   The camera rests on a sleeping woman, floating above a sofa.   (Film at 00:00-2:55).[5]   This opening sets the stage for the magical realism that follows.

The Film then cuts to the apartment of its protagonist, Elisa Esposito, a mute woman with three symmetrical clawmark-like scars on each side of her neck.   (We later learn that the scars were already on her neck when Elisa, an orphan, was found as an infant beside a river (*id.* at 27:13-28:15), and, at the end of the Film, these "scars" are revealed to be gills (*id.* at 1:56:30-1:57:40)).   We see Elisa go through her daily waking routine—including boiling eggs, setting a timer, and masturbating in her bathtub, in a matter-of-fact depiction of natural sexuality.   (*Id.* at 2:55-5:10).

Elisa's friend and next door neighbor is Giles, a closeted gay man and a struggling commercial artist, with whom Elisa communicates using sign language. Elisa and Giles together watch a tap-dancing scene on his small black-and-white television; Elisa mimics the dancing as she exits her building.   Elisa lives above a

---

[5] Citations to "Film" are to the DVD of *The Shape of Water* annexed as Exhibit 3 to the Strauss Declaration.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

6

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

movie-theater that plays classic, Technicolor films, and has a friendly relationship with the theater-owner (her landlord).  (*Id.* at 5:10-7:18).  The joy that Elisa takes in cinema, music and dancing is a recurring theme throughout the Film.

Elisa works nights as a member of a huge cleaning crew at Occam Aerospace Research Center, a massive, high-security government facility in Baltimore in 1962. Among her coworkers is her best friend Zelda, a tough, chatty, married African-American woman, who also communicates with Elisa using sign language.  While cleaning a room housing a large open-water tank, Zelda and Elisa overhear that the facility will be receiving a highly-sensitive "Asset," revealed to be a humanoid, amphibious creature, which was captured from a South American river by Colonel Richard Strickland, a cruel, imperious figure who is in charge of the "Asset" project. (*Id.* at 8:00-12:00, 20:40-21:15; 28:20-28:40).

The next day Elisa and Giles visit a local diner, where Giles gently and awkwardly attempts to flirt with the young counterman.  Returning to Giles' apartment, Elisa begins to watch news footage of fire hoses turned on civil rights marchers; Giles asks her to change the channel, preferring the escapism of a Betty Grable musical (which Giles and Elisa mimic).   (*Id.* at 12:05-15:38). Intolerance towards outsiders is a recurring theme, particularly with respect to Giles, who, it is implied, has been fired due to his sexual orientation.

At work, Elisa and Zelda meet Strickland, who converses while urinating in front of them as they clean the men's bathroom.  Strickland carries a bloody cattle prod, which he has been using to torture the Creature.  While cleaning a hallway, Elisa and Zelda hear screams of pain, and gunshots.  Strickland emerges from the room housing the Creature, and collapses to his knees; two of his fingers have been severed, and are gushing blood.  (*Id.* at 16:00-19:09).

Elisa secretly begins to visit the Creature, bringing it eggs to eat.  At first the Creature is standoffish, but the two begin to form a close bond.  The Creature is revealed to be highly intelligent, learning to communicate with Elisa using sign

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

7

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

language, and developing an appreciation for music, with Elisa selecting new records to play for the Creature during each visit. (*Id.* at 23:45-26:08; 29:39-29:54; 32:06-34:34). During one visit, Elisa dances along to the music for the Creature, in the style of the musical films that she and Giles watch on his TV—at the close of her impromptu musical number, she and the Creature press their hands together through the glass of his tank, and stare at each other longingly. Their interaction is observed by a shocked Dr. Hoffstetler, an Occam scientist. (*Id.* at 34:34-35:19).

Hoffstetler is revealed to be a Soviet spy, named "Dmitri." Hoffstetler/Dmitri reports to his handlers that the Creature is intelligent and able to communicate, and urges that they extract it from Occam as soon as possible. (*Id.* at 35:17-38:18).

In a meeting with Elisa and Zelda, Strickland reveals his intolerance, racism, and hatred for the Creature, all cloaked in devoutness. (*Id.* at 26:20-29:15). Over the course of the Film, Strickland is revealed to be increasingly monstrous, sexually abusing his wife (*id.* at 31:45-32:04), viciously torturing the Creature for sadistic pleasure (*id.* at 39:30-40:50), and sexually harassing Elisa (*id.* at 57:30-58:50).

In a meeting with his supervisor, General Hoyt, Strickland notes that the Amazonian natives worshiped the Creature as a god, and Hoffstetler explains that the Creature is able to alternate between two separate breathing mechanisms—an ability that the government hopes to exploit to gain an advantage in the Space Race. Strickland urges Hoyt to vivisect and kill the Creature; horrified, Hoffstetler pleads to keep the Creature alive, but Hoyt sides with Strickland, instructing him to "crack the damn thing open." (*Id.* at 41:20-45:01).

Elisa, who has overheard everything, begs Giles to help her save the Creature. At first he refuses, but changes his mind after suffering rejections both professional (by his former boss) and personal (by the seemingly sweet counterman, who reveals himself to be a bigot). Meanwhile, Hoffstetler/Dmitri meets with his handlers, who, to his dismay, reject his extraction plan and order him to destroy the Creature to prevent the Americans from learning anything. (*Id.* at 45:02-53:13).

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

8

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

Elisa and Giles devise an intricate escape plan, involving Giles using his art skills to disguise his van as a laundry truck and forge a fake ID allowing him entry to the facility, Elisa subtly tilting security cameras to create a "blind spot" near a garage loading ramp, and Elisa freeing the Creature and wheeling it, hidden in a laundry cart, through the service tunnels to the loading dock, where they are to rendezvous with Giles.  Hoffstetler discovers their plot and, not wanting to see "an intricate, beautiful thing destroyed," aids in the escape; Zelda, after confronting Elisa, becomes involved as well.  Their plans go awry when Strickland becomes suspicious and rushes to the loading dock, and a security guard discovers Giles' forgery and holds him at gunpoint.  However, a device planted by Hoffstetler fortuitously detonates, shutting down all lights and electricity in the facility, and (after Hoffstetler murders the guard), Giles, Zelda, Elisa and the Creature are able to escape, as Strickland fires his gun at the fleeing van.  (*Id.* at 54:50-1:07:17).

Elisa hides the Creature in her bathtub, planning to release him into a nearby canal when it opens to the ocean in several days.  (*Id.* at 1:07:40-1:11:10).  At night, while Elisa is at work, Giles discovers the Creature eating one of his cats; startled, the Creature slashes Giles' arm and flees.  Elisa finds the Creature in the theater and returns him to the apartment, where the Creature "apologizes" by placing his glowing webbed hand on Giles' balding head and wounded arm.  The next day, Giles discovers that his hair has regrown and his wounds have healed, revealing that the Creature does have godlike powers.  (*Id.* at 1:16:12-1:21:15; 1:32:15-1:32:43).

Elisa and the Creature's romantic relationship soon becomes sexual.  One night they have sex in Elisa's bathtub.  The next evening Elisa intentionally floods the entire bathroom, allowing her and the Creature to make love  underwater.  Giles discovers the two embracing; inspired, he paints the scene.  (*Id.* at 1:22:17-1:23:04; 1:29:11-1:33:50).  The night before the release, Elisa expresses her feelings in an elaborate, black-and-white fantasy sequence.  Elisa and the Creature perform a song-and-dance number (in the style of the movies Elisa and Giles watch on his

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

9

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

TV), with Elisa (able to speak in her fantasy), singing "You'll never know just how much I love you, you'll never know how much I care." (*Id.* at 1:38:05-1:40:59).

Meanwhile, Strickland grows increasingly unhinged in his efforts to find the Creature and redeem himself in Hoyt's eyes. (*Id.* at 1:09:14-1-1:15:40). He tails Hoffstetler to a meeting with his handlers, kills the Russian agents, and tortures a dying Hoffstetler into revealing Elisa and Zelda's role in the escape. Strickland threatens Zelda in her home, causing her husband to reveal that Elisa has been keeping the Creature, then searches Elisa's apartment and discovers a note revealing where she is taking the Creature. (*Id.* at 1:34:48-1:37:57; 1:41:28-1:52:02).

At the canal, Elisa and Giles say goodbye to the Creature. Strickland appears, punches Giles, and shoots the Creature and Elisa multiple times. Giles heroically fights back and rushes to help, but it appears that Elisa is dead. The Creature then uses his magical powers to heal himself. He approaches Strickland, who finally realizes the truth—"You are a god"—then slashes Strickland's throat, killing him.

As Zelda arrives with the police, the Creature takes Elisa and jumps into the canal. Under the water, the Creature kisses her, heals her wounds, and, when he applies his healing touch to her "scars," reveals them to be gills—allowing Elisa to breathe underwater. Elisa and the Creature embrace, and, in closing narration, Giles expresses his belief that they live "happily ever after." (*Id.* at 1:52:36-1:57:54).

## III. PLAINTIFF CANNOT STATE AN INFRINGEMENT CLAIM

### A. To State a Claim, Plaintiff Must Demonstrate "Substantial Similarity" Between the Works' Protected Elements

It is well-settled that to state a claim for copyright infringement, a plaintiff must establish, *inter alia*, that "'the works at issue are ***substantially similar*** in their ***protected*** elements.'" *Zella*, 529 F. Supp. 2d at 1132-33 (emphasis added) (quoting *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002)).[6] Indeed, as the

---

[6] *See also, e.g., Silas v. HBO*, 713 F. App'x 626, 627 (9th Cir. 2018); *White v. Twentieth Century Fox Corp.*, 572 F. App'x 475, 476 (9th Cir. 2014) (quotation omitted).

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

10

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

Ninth Circuit recently confirmed, even if a plaintiff could establish that the defendant *actually copied* his work, this would not be enough to impose liability, because the Copyright Act does not forbid copying of "ideas" or "concepts;" rather, the plaintiff must demonstrate that the copying in question is ***unlawful***, because the defendant copied "enough of the plaintiff's [protected] ***expression*** of those ideas or concepts to render the two works 'substantially similar.'" *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018) (emphasis added). Thus, absent the requisite "substantial similarity" in protectable expression, a plaintiff's copyright claim must be dismissed, regardless of whether the other elements of its claim are satisfied—including whether or not plaintiff has established that defendants had "access" to or "actually copied" its work. *See, e.g., id.; White*, 572 F. App'x at 476; *Shame on You Prods. v. Banks*, 120 F. Supp. 3d 1123, 1150 (C.D. Cal. 2015).[7]

"[D]etermining whether works are substantially similar involves a two-part analysis consisting of the 'extrinsic test' and the 'intrinsic test.'" *Rentmeester*, 883 F.3d at 1118; *see also, e.g., Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006). "A finding of substantial similarity under the extrinsic component is a necessary prerequisite to considering the intrinsic component, which is expressly reserved for the jury." *Esplanade Prods. v. Walt Disney Co.*, No. CV 17-02185-MWF (JCx), 2017 U.S. Dist. LEXIS 217700, at *26 (C.D. Cal. Nov. 8, 2017) (citing *Shaw v. Lindheim*, 919 F.2d 1353, 1360-61 (9th Cir. 1990)). Accordingly, on a motion to dismiss, only the extrinsic test is relevant; "[a] failure to satisfy the extrinsic component on a motion to dismiss … requires judgment for the defendant as a matter of law." *Id.* (citing *Funky Films*, 462 F.3d at 1077); *see also Rentmeester*, 883 F.3d at 1118.

---

[7] Although Defendants do not at this time seek to dismiss the Complaint based on the deficiency of Plaintiff's allegations regarding access (except to the extent Plaintiff's claims are based on the newly-copyrighted all-female version of the Play, *see infra* at 21), Defendants strongly deny that Mr. del Toro, his co-writer Vanessa Taylor, defendant Daniel Kraus, or anyone involved in writing the Film or developing its story *ever* saw, read, or even heard of the Play prior to Plaintiff asserting his claim.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

11

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

The extrinsic test "is objective in nature," and "focuses on ***articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events*** in the two works." *Funky Films*, 462 F.3d at 1077 (quotation omitted, emphasis added). Critically, in applying the extrinsic test, the Court compares "'not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" *Id.* (citation omitted). It is beyond cavil that "[n]o one can own the basic idea for a story. General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). Similarly, "*[s]cènes à faire*, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement;" nor can "[f]amiliar stock scenes and themes that are staples of literature…." *Cavalier*, 297 F.3d at 823. Accordingly, "[a]s the Ninth Circuit has emphasized, the Court 'must take care to inquire only whether "the ***protectable elements, standing alone,*** are substantially similar" and thus must "filter out and disregard the non-protectable elements"'"—including shared ideas, concepts, and *scènes à faire*—"when considering substantial similarity." *Esplanade Prods.*, 2017 U.S. Dist. LEXIS 217700, at *27 (quoting *Cavalier*, 297 F.3d at 822) (emphasis in original); *see also, e.g., Rentmeester*, 883 F.3d at 1118.

## B.   The Court Can Compare the Works and Determine Lack of Substantial Similarity as a Matter of Law on a Motion to Dismiss

"[T]he Ninth Circuit has [long] noted that … 'when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss.'" *Zella*, 529 F. Supp. 2d at 1130 (quoting *Christianson v. W. Publ'g Co.*, 149 F.2d 202, 203 (9th Cir. 1945)). Indeed, the Ninth Circuit has twice affirmed this principal in just the past few months. *See Rentmeester*, 883 F.3d at 1123 (affirming dismissal where "[n]othing disclosed during discovery could alter the fact that the allegedly

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

12

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

infringing works are as a matter of law not substantially similar"); *Silas,* 713 F. App'x at 627.  And in the last few years, ***numerous*** Central District judges have analyzed subject works on a motion to dismiss, applied the extrinsic test, and dismissed copyright claims for lack of substantial similarity.[8]  In conducting this review, "the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings."  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal quotations and citations omitted); *see also Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000) (a "court need not accept as true … allegations that contradict facts that may be judicially noticed").[9]

## C.    Applying the Extrinsic Test, There is No "Substantial Similarity" Between The Play and *The Shape of Water*, as a Matter of Law

Review of the works (rather than Plaintiff's self-serving descriptions), and application of the extrinsic test's objective criteria, demonstrates that there is no

---

[8] *See, e.g., Silas*, 713 F. App'x at 627 (affirming dismissal of claim that HBO series *Ballers* infringed plaintiff's proposed show *Off Season*); *White*, 572 F. App'x at 476-77 (affirming dismissal of claim that defendants' films infringed plaintiff's screenplay); *Esplanade Prods.*, 2017 U.S. Dist. LEXIS 217700, at *53 (dismissing claim that film *Zootopia* infringed plaintiff's proposed franchise, also called *Zootopia*); *Newt v. Twentieth Century Fox Film Corp.*, No. 15-CV-02778-CBM-JPRx, 2016 U.S. Dist. LEXIS 98308, at *39 (C.D. Cal. July 27, 2016) (dismissing claim that television show *Empire* infringed plaintiff's book/DVD/screenplay); *Astor-White v. Strong*, No. CV 15-6326 PA (RAOx), 2016 U.S. Dist. LEXIS 40608, at *17 (C.D. Cal. Mar. 28, 2016) (dismissing claim that *Empire* infringed plaintiff's treatment); *Abdullah v. Walt Disney Co.*, No. 2:15-cv-09581-SVW-JPR, 2016 WL 5380930, at *9 (C.D. Cal. Mar. 14, 2016) (dismissing claim that film *Frozen* infringed well-known children's author's story); *Gallagher v. Lions Gate Entm't, Inc.*, No. 2:15-cv-02739-ODW (Ex), 2015 U.S. Dist. LEXIS 122441, at *46 (C.D. Cal. Sept. 11, 2015) (dismissing claim that film *The Cabin in the Woods* infringed plaintiff's book); *Shame on You Prods.*, 120 F. Supp. 3d at 1169-70 (dismissing claim that film *Walk of Shame* infringed plaintiff's screenplay titled *Darci's Walk of Shame*).

[9] Opinions of anonymous Internet commenters purportedly quoted at paragraph 53 of the Complaint are irrelevant:  "[O]pinions of third parties in secondary materials . . . 'cannot prove substantial similarity under the copyright laws . . . because the works themselves, not descriptions or impressions of them, are the real test for claims of infringement.'" *Crane v. Poetic Prods. Ltd.*, 593 F. Supp. 2d 585, 595 (S.D.N.Y. 2009) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 51 (2d Cir. 1986)); *see also, e.g., RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 567 (C.D. Cal. 2005) (striking portions of complaint quoting industry commenters' comparisons of the subject works as "legally irrelevant to the issue of substantial similarity"); *Survivor Prods. v. Fox Broad. Co.*, No. CV01-3234 LGB (SHx), 2001 U.S. Dist. LEXIS 25512, at *9 (C.D. Cal. June 12, 2001) (same).

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

13

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

legally-cognizable similarity between the works, much less a "substantial" one.

**Plot and Sequence of Events:**  The plots of the two works are fundamentally dissimilar.  As explained in greater detail *supra* at 3-5, the Play is a story about a cleaning lady who starts working in a generic laboratory that conducts experiments on a variety of animals, and discovers a dolphin that has been taught to talk, but refuses to do so in order to avoid being used as a weapon of war.  Her supervisor cautions her to mind her place and not question the activities of the scientists, but Helen comes to realize that people should not simply defer to their "superiors," and must speak out against what is wrong—encouraging the dolphin itself to speak and save its own life.  Helen quits her job, and the dolphin remains in the laboratory.

*The Shape of Water*, by contrast, is an adult fairy tale about the romantic and sexual relationship between Elisa, a long-time member of the custodial staff at a large government military facility, and a humanoid, amphibious fish-man with god-like powers.  This love story at the Film's heart is evocative of *Beauty and the Beast* meets *Creature From the Black Lagoon*, except in this version the "Beast" does not need to become human to find love—it is the "human" character that is physically transformed in the end.  The film also contains numerous other major characters and interwoven subplots, including Russian agents trying to steal or kill the creature, Strickland's hatred and toxic masculinity, Giles' troubles with intolerance towards his homosexuality, all in sharp contrast to the Play's simple children's story.

The primary alleged "similarity" stems from the fact that, at the highest level of generality, both works involve a cleaning woman who forms a (vastly different) relationship with a (vastly different) marine animal/creature, which is being studied/experimented on in a (vastly different) laboratory.  But as explained *supra* at 12, that two works share the same basic ideas for stories is not a legally cognizable substantial similarity, and even where two works "share the same basic plot premise"—which is not the case here—that is not sufficient where "a closer inspection reveals that they tell very different stories."  *Benay v. Warner Bros.*

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

14

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

*Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010).   Indeed, the basic concept of a person forming a relationship with an animal (including a marine mammal) or non-human being, and helping it escape from or evade scientists, has been the subject of numerous films, including *Free Willy, Starman, Splash!, Project X* and *E.T. the Extra-Terrestrial*[10]—such a basic plot cannot form the basis of a copyright claim.   If it could, then Plaintiff's Play would surely be deemed "infringing" of earlier works, such as *The Day of the Dolphin*, a 1967 novel that, like the Play, is about dolphins in a lab that are taught to speak with humans so that they may be used in warfare.[11]

Courts in this Circuit have ***repeatedly*** rejected infringement claims based on far greater similarities in ideas and *scènes à faire* flowing therefrom.   For example, in *Benay*, the Ninth Circuit held that there was no protectible similarity between the film *The Last Samurai* and plaintiff's film bearing the *exact same title*, even though

> [B]oth [works] share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising; both have protagonists who are authors of non-fiction studies on war and who have flashbacks to battles in America; both include meetings with the Emperor and numerous battle scenes; both are reverential toward Japanese culture; … both feature the leader of the samurai rebellion as an important foil to the protagonist[; and] in both works the American protagonist is spiritually transformed by his experience in Japan.

607 F.3d at 625.   The Ninth Circuit recognized that any similarities "flow[ed] naturally from the works' shared basic [and unprotectable] plot premise," and concluded that, "[s]tripped of these unprotected elements, the works are not sufficiently similar to satisfy the extrinsic test."   *Id.*

Similarly, in *Funky Films*, both works were based on the death of a family patriarch who leaves his two sons to run the family funeral home, and both involved the return of one son to his hometown to help in the business, another son changing

---

[10] *See* https://en.wikipedia.org/wiki/Project_X_(1987_film); https://en.wikipedia.org/wiki/Splash_(film);  https://en.wikipedia.org/wiki/Starman_(film); https://en.wikipedia.org/wiki/Free_Willy; https://en.wikipedia.org/wiki/E.T._the_Extra-Terrestrial.

[11] *See* https://en.wikipedia.org/wiki/The_Day_of_the_Dolphin_(book).

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

15

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

his religion to aid in the business, and a competitor bidding on the business.  462 F.3d at 1077-78.  The Ninth Circuit noted these general similarities but affirmed dismissal, concluding that "general plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *Id.* at 1081.

And in *Shame on You*, the court granted a motion to dismiss, holding that there was no protectable similarity between the defendant's film *Walk of Shame* and plaintiff's screenplay *Darci's Walk of Shame*, even though, *inter alia*,

> [B]oth works feature a female lead character living in a big city, who breaks up with her boyfriend, gets drunk, spends a "one-nighter" with a man she just met who works as a busboy/bartender, wakes up disoriented the next morning at his place, puts on the bright dress she was wearing the night before, and embarks on a walk of shame through the city to get to an important event.

120 F. Supp. 3d at 1151.  Again, the court concluded that "many of the purported similarities … flow directly from the [unprotectible] basic premise of a walk of shame," and that, despite the similarities, the overall "'narratives are strikingly different.'"  *Id.* at 1151, 1153 (quoting *Benay*, 607 F.3d at 625).[12]  As in the aforecited cases, the works at issue here tell "fundamentally different stories," even if they "share [a somewhat similar] premise and … elements that flow naturally from that premise." *Benay*, 607 F.3d at 626.  Thus, no infringement claim can lie.

Plaintiff's remaining claimed plot similarities involve gross mischaracterizations of the works.  Plaintiff claims that in both works, the heroine

---

[12] *See also, e.g., Berkic,* 761 F.2d at 1293 (no substantial similarity between two works about exposing a criminal organization that murders healthy people and sells the organs for transplants); *Cavalier,* 297 F.3d at 824 ("[T]he general premise of a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall asleep" is not protected by copyright law); *Astor-White,* 2016 U.S. Dist. LEXIS 40608, at *13 (no substantial similarity between two works "involv[ing] a successful and wealthy African American entertainment mogul with three children involved in the recording industry");  *Buggs v. Dreamworks, Inc.,* No. CV 09-07070 SJO (AGRx), 2010 U.S. Dist. LEXIS 141515, at *13  (C.D. Cal. Dec. 28, 2010) ("[T]he basic plot of pests with human attributes getting flushed [down a drain] and saving their communities is not protectable"); *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1112 (N.D. Cal. 2010) (plot of "a cocky young race-car driver … who learns life lessons from an older mentor" is not protectable); *Gallagher*, 2015 U.S. Dist. LEXIS 122441, at *9, 12 (common premises of "five young adults venturing off to a cabin in the wilderness and being manipulated … by a third party," and "students  travelling to remote locations and subsequently being murdered," were not protectable).

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

16

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

forms a "deep, loving bond" with a marine creature (Compl. ¶¶ 1, 22, 31), but there is no similarity between the dolphin in the Play and the humanoid, godlike creature in the Film (*see infra* at 19-20), and there is certainly no similarity in Helen and Elisa's respective relationships with the dolphin and the Creature.   In the Play, Helen may care for the dolphin, but she treats it as an animal, occasionally grows angry with it and yells at it, and ultimately leaves it behind in the laboratory.  This does not remotely resemble Elisa's ***romantic and sexual*** relationship with the Creature, which is not a mere animal but rather a godlike being who, in the fairy tale end, magically brings Elisa back from the dead and reveals her neck scars to be gills, allowing them to live together "happily ever after" under the water.[13]

Plaintiff also claims as a purported similarity that Elisa "discover[s] that [the Creature] can indeed communicate—but chooses to do so only with her." (Compl. ¶ 31).  This too is a gross mischaracterization.  In the Play, the entire purpose of the experiments is to teach the dolphin to communicate; the dolphin refuses, because it does not wish to be used for war.  (*See supra* at 3-5).  In the Film, General Hoyt and Strickland are not interested in communicating with the Creature at all.   The Creature does not "choose to communicate only with Elisa"—rather, she (and later Giles) is the only person who *attempts* to communicate with him.

Finally, Plaintiff claims that the plots are similar because "Elisa hatches a plan to sneak the creature out of the lab in a laundry cart," and Helen supposedly "hatches a [similar] plan" in the Play.  (Compl. ¶¶ 22, 31).  But Helen does not "hatch any plan" at all—it is *the dolphin* that hatches the plan, and Helen is initially uncomprehending.  Moreover, the "plan" never even gets underway—the entire

---

[13] Plaintiff misleadingly claims that the respective bonds are formed "[t]o the sounds of romantic … music playing on a record player." (Compl. ¶ 1).  But there is no similarity between the scientists in the Play torturously playing a recording every seven minutes for months, in an effort to teach the dolphin to repeat the words, and the scenes in the Film involving Elisa carefully selecting music in order to entertain the Creature.  (*See supra* at 8).  Indeed, the all-female version of the Play specifies that, far from "romantic," the record's vocals involve "an eerily precise enunciation of the words." (Strauss Decl. Ex. 2 at 5).  And only in the Film is the love of cinema and music a theme and plot point.

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

17

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

"escape attempt" takes up just a minute or so at the end of the Play; Helen is quickly thwarted before she even gets the dolphin out of his tank (much less into the hamper), and Helen ultimately quits her job, leaving the dolphin behind. (*See supra* at 5). By contrast, in the Film, Elisa and Giles (not the Creature) hatch an elaborate escape plan (of which the use of a laundry cart is only a small part), that is successful—after numerous complications and moments of high tension (and death)—and unfolds over a lengthy thirteen minute set piece. (*See supra* at 9).

For the same reasons that their plots are totally dissimilar, the works do not share any similarity in sequence of events. While the quickly-aborted escape attempt occurs at the end of the Play, the successful escape occurs at the Film's *midpoint*—numerous critical events occur *after* the escape, including Strickland unravelling and hunting down the Creature, the Russian subplot and, of course, the Creature and Elisa living together, and the love story that is the heart of the Film. *See Gallagher*, 2015 U.S. Dist. LEXIS 122441, at *13-14 (rejecting purported similarity based on "presence of a controlling third party" where "[t]he presence of a third party is the very first thing the viewer learns of in [defendant's film], whereas in [plaintiff's book] the third party is not revealed until the very end"). There is no analog for these events in the Play; it is thus plain that the two works "tell fundamentally different stories." *Benay*, 607 F.3d at 626.

***Characters:*** To be deemed protectable in the Ninth Circuit, characters must, *inter alia*, be "especially distinctive" and "contain some unique elements of expression." *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015) (internal quotations and citation omitted). "'[T]raits that flow naturally from the works' shared premises' do not 'have significance under copyright law.'" *Astor-White*, 2016 U.S. Dist. LEXIS 40608, at *14 (quoting *Benay*, 607 F.3d at 626).

Plaintiff argues that there is a protectible similarity between the characters of Helen and Elisa because both are "lonely janitorial cleaning wom[e]n" (Compl. ¶¶ 22, 31), but beyond the fact that they have somewhat similar jobs—which does not

16127309
202894-10043

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

support a copyright claim[14]—there is no similarity between the characters.  Contrary to Plaintiff's assertion, there is no indication in the Film that Elisa is "lonely" or "introverted"—she has close friends in Giles and Zelda, and a warm relationship with her landlord the theater owner.  While she is incapable of speech, she is intelligent and vibrant, not shy, and communicates using sign language.  Indeed, Elisa is the catalyst for change throughout the Film, encouraging Giles, Zelda, and even a Russian spy to follow her lead.  By contrast, Helen is not portrayed as intelligent, there is no indication that she has any friends or interests outside of work, and she does not attempt any affirmative action until the very end of the Play, as a result of the dolphin's urging.  Elisa takes great joy in music and cinema; Helen does not even own a television.  (Play at 8).   Elisa has a complex sexual dimension; there is certainly nothing said in the Play concerning Helen's romantic life or sexuality.  And, in the end, Elisa is revealed to be not quite "human" after all.  Elisa's "scars"—which she had from the time she was discovered, as a baby, near a river—are revealed to be incipient gills (*supra* at 10), explaining the affinity for water, and the Creature, that Elisa had displayed throughout the Film.  (*See, e.g.,* Film at 4:20-4:40, 1:23:25-1:24:00).  The characters are nothing alike.

Plaintiff also argues that there is a protectable similarity between the Play's dolphin and the mythical godlike Creature in *The Shape of Water*.  (Compl. ¶ 47).  This is absurd.  While dolphins are obviously intelligent animals, a dolphin (even one with the remarkable ability to speak a few, simple words through its blowhole) is not a human; it certainly is not the same as a humanoid river-god that enters into a sexual relationship with a human woman, can magically cure injuries and baldness and even bring people back from the dead, and is powerful enough to fight back against its tormentors (first severing Strickland's fingers and later slashing his

---

[14] *See Flaherty v. Filardi*, No. 03 Civ. 2167 (LTS) (HBP), 2009 U.S. Dist. LEXIS 22641, at *49-50 (S.D.N.Y. Mar. 20, 2009) ("Although both draft screenplays have an attorney protagonist … the attorneys are very different.").

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

19

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

throat).  Nor is there any physical resemblance between the Creature (an amphibian with a human-like body) and an ordinary dolphin.

Moreover, as would be expected in two very different stories, there are major characters in the Play that have no analog in the Film, and vice versa.  Indeed, the only two characters in the Play that have significant speaking roles besides Helen are Miss Moray and Dan, yet neither of these characters have any conceivable counterparts in the Film.[15]  And the Film has numerous major characters that do not remotely resemble anyone in the Play, including Strickland, the primary villain and "monster" that drives much of the plot; Hoffstetler/Dmitri, the surprisingly sympathetic Soviet spy; and Elisa's close friends Giles and Zelda—roles so significant that the acclaimed actors portraying them were nominated for Oscars.[16]

In an attempt to manufacture a nonexistent similarity, Plaintiff argues that Helen works with "a talkative, humorous cleaning woman" named Danielle—a character that supposedly resembles the Film's Zelda.  (Compl. ¶¶ 22, 43).  However, no such character appears <u>anywhere</u> in the originally-registered Scholastic version of the Play (*see generally* Strauss Decl. Ex. 1), or the television movies based on the Play on which Plaintiff relies for his theory of "access."[17]  The newly-registered, all-female version does contain a character named "Danielle," but "Danielle" is merely the original's "Dan" by another name—other than flipping

---

[15]  Plaintiff suggests that Miss Moray somehow resembles the Film's minor character "Fleming" merely because they are both "supervisors."  (Compl. ¶¶ 43(P)-(O)).  There is no protectible "similarity" between Moray, the second-most significant character in the Play, and a "briskly efficient supervisor" (*see supra* at 3) and Fleming, an inconsequential and ineffectual minor character, used mainly for comic relief.  (*See, e.g.,* Film at 1:09:13-1:09:48).

[16]  *See Funky Films*, 462 F.3d at 1079 (emphasizing characters from defendant's work who were not present in plaintiff's work); *Benay*, 607 F.3d at 627 ("There are a number of important characters in the Film and the Screenplay who have no obvious parallel in the other work."); *Gallagher*, 2015 U.S. Dist. LEXIS 122441, at *29 ("Outside of the five main characters that comprise each group of friends, both works have numerous characters that have no counterpart in the other, and the pervasiveness of these characters points the Court towards finding that the works are not substantially similar.").

[17]  *See* https://www.imdb.com/title/tt0248152/fullcredits?ref_=tt_cl_sm#cast; https://www.imdb.com/title/tt1417793/fullcredits?ref_=tt_cl_sm#cast.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

20

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

genders there are no changes to the character.  Contrary to Plaintiff's allegation, "Danielle" is not a "cleaning woman" at all—like Dan, she is night porter, who does not clean alongside Helen but rather transports instruments used to euthanize, dissect and experiment on the lab's animals.  (*See, e.g.,* Strauss Decl. Ex. 2 at 4, 8, 18, 24).   Whether named Dan or Danielle, there is no similarity between this character—who first meets Helen as the Play begins, does not work directly with Helen, is not her friend, and speaks jollily of sawing through the dolphin's and other animals' skulls (*id.* at 18)—and Zelda, Elisa's long-time best friend who works directly with her, acts as her translator, and risks all to aid Elisa and the Creature.

Plaintiff's failure to disclose that "Danielle" only appears in a newly-registered, all-female version of the Play is grossly misleading—if anything, that all of the characters (including the scientists) in this version are female renders it fundamentally *different* from the Film, which has numerous main characters that are male, including Strickland, an avatar of toxic masculinity.  Plaintiff may not "mix and match" allegations of similarities across multiple versions of the Play.[18] Further, to the extent Plaintiff's infringement claim depends on purported similarities between the Film and this all-female version of the Play, Plaintiff's claims must also fail because he has failed to plausibly plead that any all-female version of the Play was widely disseminated, or that Defendants otherwise had *access* to this newly-registered version of his father's work.[19]

---

[18] *See Nat'l Comics Publ'ns, Inc. v. Fawcett Publ'ns, Inc.*, 198 F.2d 927, 927 (2d Cir. 1952) (determination of infringement "will demand a comparison of each [comic] strip put in suit by the plaintiff with [defendant's] strip . . . .  The plaintiff may put in suit as many strips as it pleases, but it must prove infringement of each, or it will lose as to that strip"); *Dean v. Cameron*, 53 F. Supp. 3d 641, 647 (S.D.N.Y. 2014) ("[A] court must not 'aggregate' a plaintiff's work, but must consider each allegedly infringed work independently."); *Doody v. Penguin Grp. (USA) Inc.*, 673 F. Supp. 2d 1144, 1156 (D. Haw. 2009) ("Pulling out disparate aspects across multiple works would disembowel this analysis and result in a list of random similarities . . . .").

[19] *See, e.g., Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003) (video that sold 17,000 copies not "widely disseminated"); *Johnson v. Knoller*, No. CV 16-7761-R, 2017 U.S. Dist. LEXIS 217782, at *3-4 (C.D. Cal. Sept. 18, 2017) (dismissing claim where "[p]laintiffs have not met their pleading burden of showing more than a bare possibility that Defendants had access to" the allegedly infringed work).

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

21

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

***Themes:*** The themes of the two works are quite different. The primary theme of the Play, which is found nowhere in the Film, is its explicit anti-animal experimentation message (as well as a secondary anti-war sentiment); in furtherance of this theme, the Play urges that people should speak up against authority. (*Supra* at 5). *The Shape of Water*, by contrast, has numerous themes that bear no relationship to the Play's straightforward anti-animal experimentation / pro-protest message. These themes include the power of friendship, the fluid nature of love, the power of music and cinema, unexpected soulmates, society's intolerance towards outsiders, racism, sexual identity and repression, the banding of misfits, and toxic masculinity (embodied in the form of the abusive Strickland).

***Dialogue:*** "[E]xtended similarity of dialogue [is] needed to support a claim of substantial similarity," *Olson v. NBC*, 855 F.2d 1446, 1450 (9th Cir. 1988); *see also, e.g., Esplanade Prods.*, 2017 U.S. Dist. LEXIS 217700, at *43, and "[o]rdinary words and phrases are not entitled to copyright protection." *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1071 (C.D. Cal. 2010). Here, *The Shape of Water,* which has a two-hour running time, has no similarity of dialogue with the Play, extended or otherwise. At most, Plaintiff identifies a few individual (and common) *words* that appear both works, but even then Plaintiff misrepresents the (completely different) contexts in which they are used.[20]

***Setting:*** The settings of the two works are likewise vastly different. The Play takes place entirely in a small, civilian laboratory in a New York City office building. The Film, by contrast, takes place in numerous settings in Baltimore,

---

[20] For example, Plaintiff falsely claims that, in both works, "lab personnel" use the word "vivisection" in "describing how they are going to kill the creature." (Compl. ¶ 42(TT)). In fact, the word "vivisection" does not even appear in the originally-registered, Scholastic version of the Play—the word "dissection" is used. (Play at 16). In the newly-registered, all-female version, Moray (who is not "lab personnel") does use the word vivisection, but only in describing what had happened to a cat, in the past. The dolphin is not going to be "vivisected" (*i.e.*, operated on while still alive); it is to be injected with nicotine mustard, and then dissected. (Strauss Decl. Ex. 2 at 19, 22, 30). In any case, "vivisect" and "dissect" are common scientific terms, and use of common words is not infringement.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

22

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

including Occam (a gargantuan, highly restricted government aerospace facility), Elisa's and Giles' apartments, the offices of Giles' former employer, the local diner, apartments and homes of various other characters (including Hoffstetler, Zelda and Strickland), the cinema beneath Elisa's apartment, the restaurant and remote sand dunes where Hoffstetler clandestinely meets with his Soviet handlers, the canals where the Film's climax takes place, a commuter bus, various Baltimore streets, and more.  *See Silas*, 201 F. Supp. 3d at 1176 (plaintiff's work primarily took place in a single setting, while defendant's show "takes place in a wide variety of settings").  While Plaintiff alleges that part of the setting for both works is a laboratory facility (Compl. ¶¶ 22, 31), this simply ignores the numerous other locations in which key events of the Film take place.  In similar circumstances, in *Gallagher*, the court found that the settings for the two works were different *even though both involved a group of friends traveling to a cabin where they are (apparently) murdered*, because, *inter alia*, approximately half of defendant's film also took place in an elaborate underground facility:  "[T]he Court is not convinced that the setting for half of *Cabin*'s scenes and an integral aspect of the plot constitutes merely a minor difference."  2015 U.S. Dist. LEXIS 122441, at *33; *see also, e.g., Benay*, 607 F.3d at 628 (settings were not similar partly because "[t]he Film includes extended scenes in a samurai village" and "[n]o such village appears in the Screenplay").

Further, the labs in the two works are very different.  In the Play, the nonsecure, civilian lab comprises a single room in a small New York City office, with only a few workers ever seen.[21]  In the Film, Occam is a massive, heavily-staffed highly-restricted government facility guarded by military police, with many employees, numerous rooms, hangars, an ultra-modern control center with glass offices, immense hallways, service tunnels, a loading dock and a parking garage.

---

[21]  Plaintiff claims that ABADABA is a "secret" laboratory facility (Compl. ¶ 42(F)), but there is nothing in the Play to suggest that this is the case; to the contrary, Dan refers to "[a]ll the magazines and newspapers" photographing the lab's dolphins.  (Play at 12).

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

23

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

*See Gallagher*, 2015 U.S. Dist. LEXIS 122441, at \*32 ("The cabins themselves are in stark contrast with one another …. Thus, beyond the basic premise of a remote cabin, there are no similarities in the setting ….") (internal quotations and citations omitted).[22]   In any case, a lab setting is a *scène à faire* flowing naturally from the (unprotectable) premise of a person forming a relationship with an animal sought or studied by scientists, and cannot support a finding of substantial similarity.

   **Pace and Mood:**  The two works are completely dissimilar in pace and mood. The Play is slow-moving and deliberate.  It follows a single character, Helen, who works in a small office and interacts with only a few other characters, particularly Moray.  *The Shape of Water* is far faster-paced, cross-cutting between numerous characters and settings in telling a far more complex story.

   In terms of mood, the Play's anti-animal experimentation message is direct, straightforward, and fit for children's consumption—it is no accident that the Play was first published in Scholastic Voice.  The Film's tone and mood, by contrast, are intentionally adult and complex.  Magical realism and eroticism flow throughout.  A sense of joy pervades, expressed by, *inter alia*, the classic movie musicals and dance numbers that Elisa enjoys, and which bleed into the reality of the Film and are also reflected in the movie's score.  But there is an undercurrent of darkness as well, embodied by Strickland (the Film's "Monster"), and moments of high tension and graphic violence amidst the joy, including numerous murders—one of which is committed by Hoffstetler/Dmitri, one of the Film's heroes, demonstrating the work's moral complexity.  In these ways as well, the works are completely different. *See, e.g., Schkeiban v. Cameron*, No. CV 12-0636-R (MANx), 2012 U.S. Dist. LEXIS 145384, at \*5-6 (C.D. Cal. Oct. 4, 2012) (mood and pace dissimilar where

---

[22] Plaintiff misleadingly alleges that both labs perform experiments "during the height of the Cold War."  (Compl. ¶¶ 22, 31).  In fact, the Play is set in then present-day 1969, and the words "Russia," "Soviet Union" or "Cold War" are never mentioned.  The Film, on the other hand, is a period piece, set in the early 1960s, and Russian spies play a pivotal role. In addition, the Play, written at the height of protests against U.S. involvement in Vietnam, has an anti-war message that is absent from the Film.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations
16127309
202894-10043
24
MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

plaintiff's work was a children's story with a "simple protagonist" and few twists and turns, while defendants' film *Avatar* was a longer, "more complex story" with many more storylines), *aff'd*, 566 F. App'x 616 (9th Cir. 2014).

*Plaintiff's Allegations of Scattered Similarities:*  Despite the vast differences between the works, Plaintiff, as copyright plaintiffs often do, proffers a lengthy list of supposed "similarities" between the Play and the Film.  (Compl. ¶ 43).  But as the Ninth Circuit has repeatedly held, such "lists of similarities" are "inherently subjective and unreliable," especially where they "emphasize[] random similarities scattered throughout the works."  *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984); *see also, e.g., Cavalier*, 297 F.3d at 825; *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045-46 (9th Cir. 1994).

The Court's review of the works will reveal that *none* of the alleged "similarities" have merit, because (1) the purported similarities result from mischaracterizations of the works designed to give a false appearance of a similarity that does not exist—including Plaintiff's misleading effort to improperly "mix and match" alleged similarities involving two different versions of the Play (*see supra* at 21), and/or (2) the purported similarities consist of unprotectible ideas, stock elements and tropes, and *scènes à faire* deriving therefrom.  These ideas and elements are not protectable and, as discussed, are expressed in extremely different ways in the two works.  It is not a close call.

## IV.   CONCLUSION

This Court should dismiss the Complaint in its entirety, with prejudice.[23]

---

[23] Plaintiff also alleges, upon information and belief, that defendants del Toro and Kraus have written a novelization of the Film which "will likewise violate Plaintiff's copyrights"—even though the novel had not even been published at the time Plaintiff filed his Complaint (Compl. ¶ 41). Any claims against Mr. Del Toro or Mr. Kraus pertaining to the novelization must be dismissed for the reasons set forth in the motion to dismiss filed by MacMillan Publishing Group, LLC.

Because Plaintiff's direct infringement claim fails as a matter of law, his second and third causes of action for secondary infringement must also be dismissed. *See, e.g., A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

25

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

1    Dated: May 7, 2018                          LOEB & LOEB LLP
                                                 EDWARD K. LEE
2                                                JONATHAN ZAVIN (*pro hac vice*)
                                                 JONATHAN NEIL STRAUSS (*pro hac vice*)
3

4                                                By: ___*/s/ Edward K. Lee*_____
                                                     Edward K. Lee
5                                                    Attorneys for Defendants FOX
                                                     SEARCHLIGHT PICTURES, INC.,
6                                                    TWENTIETH CENTURY FOX FILM
                                                     CORPORATION, TSG
7                                                    ENTERTAINMENT FINANCE, LLC,
                                                     GUILLERMO DEL TORO and DANIEL
8                                                    KRAUS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

16127309
202894-10043

26

MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS