Marc Toberoff (CA State Bar No. 188547)
*mtoberoff@toberoffandassociates.com*
Douglas Fretty (CA State Bar No. 279829)
*dfretty@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

Attorneys for Plaintiff David Zindel, as Trustee
for the David Zindel Trust and the Lizabeth Zindel Trust

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ZINDEL, as Trustee for the David Zindel Trust and the Lizabeth Zindel Trust, <br><br> Plaintiff, <br><br> vs. <br><br> FOX SEARCHLIGHT PICTURES, INC., a Delaware corporation; TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation; TSG ENTERTAINMENT FINANCE LLC, a Delaware limited liability company; MACMILLAN PUBLISHERS, LTD., a subsidiary of a German limited liability company; GUILLERMO DEL TORO, an individual; DANIEL KRAUS, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 2:18-cv-01435-PA-KSx <br><br> Assigned to: Hon. Percy Anderson <br><br> **OPPOSITION TO FILM DEFENDANTS' MOTION TO DISMISS COMPLAINT (Dkt. 37)** <br><br> Date: July 9, 2018 <br> Time: 1:30 p.m. <br> Ctrm.: 9A <br><br> *[Filed concurrently: Plaintiff's Request for Judicial Notice; Declaration of Douglas Fretty; [Proposed] Order]* <br><br> Complaint Filed: Feb. 21, 2018 |

# TABLE OF CONTENTS

I.    **INTRODUCTION** ...................................................................1

II.   **STATEMENT OF FACTS** ...................................................2

    A.    Plaintiff's Play, *Let Me Hear You Whisper*...............................2

    B.    Defendants' Film, *The Shape of Water* ...................................5

III.   **ARGUMENT** .........................................................................5

    A.    Rule 12(b)(6) Should Not Be Abused To Dismiss Copyright Cases Based on Subjective Opinion, Usurping the Role of the Fact Finder.......7

          "No Reasonable Juror" Standard .........................................8

          Improper Reliance on Added Differences .........................10

          "Selection or Arrangement" Standard ..............................11

    B.    Defendants Cannot Evade Plaintiff's Allegations of Access.................12

    C.    Objective Substantial Similarity Exceeds the Pleading Standard ..........12

        1.    "Inverse Ratio Rule" Lowers the Required Showing of Similarity. ...................................................12

        2.    Myriad Similarities Between the Play and Film Demonstrate That a Reasonable Juror Could Find Substantial Similarity ........13

            Plot and Sequence ...............................................13

            Characters ...........................................................18

            Themes ................................................................21

            Mood/Pace ..........................................................22

            Dialogue ..............................................................23

            Setting..................................................................24

            Totality of Similarities .........................................24

    D.    Under Defendants' Standard, Copycats Could Infringe Their Film.......25

IV.   **CONCLUSION** ...................................................................25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Apple Computer, Inc. v. Microsoft Corp.*,

4

35 F.3d 1435 (9th Cir. 1994) ...................................................................... 7

5

*Atkins v. Fischer*,

6

331 F.3d 988 (D.C. Cir. 2003) .................................................................... 9

7

*Baxter v. MCA, Inc.*,

8

812 F.2d 421 (9th Cir. 1987) ...................................................................... 9

9

*Benay v. Warner Bros. Emtnt.*,

607 F.3d 620 (9th Cir. 2010) ............................................................... 7, 16

10

*Berkic v. Chrichton*,

11

761 F.2d 1289 (9th Cir. 1985) .................................................................... 7

12

*Betty, Inc. v. PepsiCo, Inc.*,

13

283 F. Supp. 3d 154 (S.D.N.Y. 2017) ................................................. 11, 21

14

*Buggs v. Dreamworks, Inc.*,

15

2010 WL 5790251 (C.D. Cal. Dec. 28, 2010) ............................................. 7

16

*C&SM Int'l v. Wholesale-fashionsquare.com, Inc.*,

17

No. 2:18-cv-630, 2018 WL 2213453 (May 14, 2018) ................................. 12

18

*Cabell v. Zorro Prods. Inc.*,

19

No. 5:15-cv-771, 2017 WL 2335597 (N.D. Cal. May 30, 2017) ........... 13, 24

20

*Cavalier v. Random House, Inc.*,

21

297 F.3d 815 (9th Cir. 2002) ...................................................................... 7

22

*Columbia Pictures Indus., Inc. v. Miramax Films Corp.*,

23

11 F. Supp. 2d 1179 (C.D. Cal. 1998) ................................................. 18, 25

24

*Crane v. Poetic Prods. Ltd.*,

25

593 F. Supp. 2d 585 (S.D.N.Y. 2009) ......................................................... 8

26

*Danjaq, LLC v. Universal City Studios, LLC*,

27

No. CV-14-2527, 2014 WL 7882071 (C.D. Cal. Oct. 2, 2014) ........... 16, 17

28

*DC Comics v. Towle*,
802 F.3d 1012 (9th Cir. 2015) .............................................................. 20

*DC Comics v. Towle*,
989 F. Supp. 2d 948 (C.D. Cal. 2013) .............................................. 12, 25

*Dillon v. NBCUniversal Media LLC*,
No. CV-12-9728, 2013 WL 3581938 (C.D. Cal. June 18, 2013).................... 9, 10, 12

*Fleener v. Trinity Broad. Network*,
203 F. Supp. 2d 1142 (C.D. Cal. 2001) .................................. 13, 15, 16, 18

*Funky Films, Inc. v. Time Warner Ent. Co.*,
462 F.3d 1972 (9th Cir. 2006) .......................................................... 7, 16

*Gal v. Viacom Int'l, Inc.*,
403 F. Supp. 2d 294 (S.D.N.Y. 2005) .............................................. 17, 21

*Gay v. Facebook, Inc.*,
No. 16-cv-3013, 2016 WL 10650825 (N.D. Cal. Oct. 19, 2016)............................ 12

*Green v. MGM Studios, Inc.*,
No. CV-08-2376, 2008 WL 11338272 (C.D. Cal. Nov. 24, 2008) ............................ 8

*Jacobsen v. Deseret Book Co.*,
287 F.3d 936 (10th Cir. 2002) ........................................................... 10

*Kaseberg v. Conaco, LLC*,
260 F.3d 1229 (S.D. Cal. 2017) ........................................................... 9

*Kouf v. Walt Disney Pictures & Telev'n*,
16 F.3d 1042 (9th Cir. 1994) ............................................................. 9

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
676 F.3d 841 (9th Cir. 2012) ..................................................... 8, 13, 16

*Lawrence Crane Ent., Inc. v. Abrams*,
No. CV-11-7797, 2013 WL 12123997 (C.D. Cal. Jan. 28, 2013)............................ 15

*Leigh v. Warner Bros., Inc.*,
212 F.3d 1210 (11th Cir. 2000) ........................................................... 8

*Marchel Design, Inc. v. Best Master Enters., Inc.*,
No. CV-08-3654, 2008 WL 4723113 (C.D. Cal. Oct. 23, 2008) ......................... 9, 17

*Metcalf v. Bochoco*,
294 F.3d 1069 (9th Cir. 2002) ...................................................................... 11, 16, 24

*MGM, Inc. v. Am. Honda Motor Co.*,
900 F. Supp. 1287 (C.D. Cal. 1995) ...................................................................... 25

*Olson v. NBC*,
855 F.2d 1446 (9th Cir. 1988) ................................................................................ 24

*RDF Media Ltd. v. Fox Broad. Co.*,
372 F. Supp. 2d 556 (C.D. Cal. 2005) ..................................................................... 9

*Rentmeester v. Nike, Inc.*,
883 F.3d 1111 (9th Cir. 2018) .................................................................................. 9

*Satava v. Lowry*,
323 F.3d 805 (9th Cir. 2003) .................................................................................. 11

*Shaw v. Lindheim*,
919 F.2d 1353 (9th Cir. 1990) ..................................................................... *passim*

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
81 F.2d 49 (2d Cir. 1936) ....................................................................................... 10

*Sid & Marty Krofft Telev'n Prods., Inc. v. McDonald's Corp*,
562 F.2d 1157 (9th Cir. 1977) ........................................................................... 18, 21

*Silas v. HBO, Inc.*,
201 F. Supp. 3d 1158 (C.D. Cal. 2016) .................................................................. 15

*Smart Inventions, Inc. v. Allied Commc'ns Corp.*,
94 F. Supp. 2d 1060 (C.D. Cal. 2000) .................................................................... 16

*Spry Fox LLC v. LOLApps Inc.*,
No. 2:12-cv-147, 2012 WL 5290158 (W.D. Wash. Sept. 18, 2012) ........................ 20

*Straughter v. Raymond*,
No. CV-08-2170, 2011 WL 3651350 (C.D. Cal. Aug. 19, 2011) ............................ 12

*Swirsky v. Carey*,
376 F.3d 841 (9th Cir. 2004) ............................................................................ 8, 13

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000) ...................................................................... 7, 11, 12

*Tufenkian Imp./Exp. Vent., Inc. v. Einstein Moomjy, Inc.*,
338 F.3d 127 (2d Cir. 2003) ..................................................................... 11, 15, 17

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
715 F.2d 1327 (9th Cir. 1983) ................................................................................ 9

*Unicolors, Inc. v. H&M Hennes & Mauritz LP*,
No. CV-16-2322, 2016 WL 10646311 (C.D. Cal. Aug. 12, 2016) ........................... 8

*Walt Disney Prods. v. Air Pirates*,
581 F.2d 751 (9th Cir. 1978) ................................................................................ 10

*Wilson v. The Walt Disney Company*,
No. 14-cv-01441, 2014 WL 4477391 (N.D. Cal. July 30, 2014) ........................ 8, 21

*Wolf v. Travolta*,
167 F. Supp. 3d 1077 (C.D. Cal. 2016) ................................................................ 15

**Other Authorities**

1 *Nimmer on Copyright* § 3.04 (2009) ...................................................................... 11

2 *Nimmer on Copyright* § 143.4 (1976) .................................................................... 12

4 *Nimmer on Copyright* § 13.03 (2009) ............................................................. 10, 17

## I.     **INTRODUCTION**

The first two acts of *The Shape of Water* ("Film") closely parallel the well-known fantasy/sci-fi play *Let Me Hear You Whisper* ("Play") by Pulitzer prize-winning author Paul Zindel. Defendants predictably, and improperly, rely on elements added to their Film, largely in its ***third*** act, once the heroine and creature escape. But what elevates the Film is not these additions – rather, it is the special story of a seemingly insignificant, lonesome laboratory janitor who forms a deep, compassionate bond with a remarkable aquatic creature who sees and loves her for who she is, and will be senselessly killed unless she saves him. That idiosyncratic story, and the dramatic ***choices*** Zindel made in telling it, is ***the essence*** of the Play and Film.

Rather than confront numerous concrete similarities, Defendants abstract the Play to high-level "ideas," then mislabel all its expressive elements as "unprotectable." Defendants' also improperly focus on their ***additions*** – but this does not immunize them from liability for their infringing ***similarities***. Defendants likewise ignore the rule that similar selection and arrangement of even unprotected elements is sufficient to overcome a Rule 12(b)(6) motion. Defendants' bag of tricks is commonplace, and sometimes leads courts to error, but they badly distort the Ninth Circuit's careful framework for evaluating copyright infringement. In sum, draconian dismissal on the pleadings should be reserved for frivolous cases, or else both plaintiffs and courts are robbed of expert analysis (often critical to the extrinsic test) and the benefit of a fully developed record. Dismissal is especially inappropriate here, where the Court must compare an unperformed printed stage play to a fully realized film, and weigh the dramatic interplay of multiple literary and aesthetic elements. Such an inherently subjective inquiry should not be made on the pleadings, except in very clear-cut cases.

The Film's added elements (*e.g.*, sadistic villain, Cold War paranoia, gruff General, Soviet spies, violence) are things we have all seen before. Indeed, Defendant Del Toro even said he hoped to make *The Creature from the Black Lagoon* where the creature "gets the girl," and unsurprisingly, the Film's creature is a near carbon copy

of that Amazonian aqua-man. Defendants even point to the familiar story of *Splash!* (1984) which undermines their own Motion. But what we have ***not*** seen before, except in the Play, is the captivating core story that animates the Film. So much so that it led to a spontaneous outpouring of objections by many who read the Play. Considering the Play's wide dissemination, Defendants' access, the myriad objective similarities, and their similar dramatic and thematic impact, the Court cannot say that "no reasonable juror could find substantial similarity," as required on a 12(b)(6) Motion.

## II.   STATEMENT OF FACTS

The following summary of the Play and Film is necessary to correct Defendants' description of the works, which tellingly omits or glosses over parallel plot points and character beats. Plaintiff wholeheartedly agrees that the works speak for themselves.

### A.   Plaintiff's Play, *Let Me Hear You Whisper*[1]

The Play's story is told in ***two acts***. The Play is set, when written, in the late 1960s (during the height of the Cold War) in a large multi-floor scientific facility in New York City, near docks on the Hudson River. The laboratory performs experiments on mammals for secret military purposes. The Play opens with Dr. Crocus, a dedicated scientist, and an assistant Mrs. Fridge, conducting an experiment in one of the labs on a Dolphin, who is confined to a long narrow glass tank, prodded via electrodes for an emotional response ("pain," "pleasure," "anger," "fear"). Play at 5. Helen, a janitorial cleaning lady who works the night shift, arrives. Self-sufficient, methodical and quiet, she is greeted by Miss Moray, a "briskly efficient supervisor" who is condescending, censorious and self-righteous with Helen. Moray informs her that the facility also has a "natatorium" for the Dolphin to swim, at the scientist's discretion. Meeting Danielle, a chatty co-worker, Helen tersely indicates that she is unmarried, but would like to be

---

[1] References to "Play" are to the unabridged play (Mtn., Ex. 2) unless otherwise noted. Contrary to Defendants' mischaracterization, Plaintiff does not "mix and match" the abridged (Mtn., Ex. 1) and unabridged plays (Mtn. at 21). Defendants concede that the unabridged Play is "identical to the [1970] version in all material respects," except that the characters, such as Danielle, are female. Mtn. at 6. Plaintiff thus alleges that the Film infringes both versions, and for convenience will cite to the unabridged Play.

married. Danielle responds: "You don't like to talk do you?" *Id.* at 9.

Once Helen is alone in the lab, a ***record player*** plays a romantic song from a ***1940s film musical***: "Let me call you sweetheart / I'm in love with you / Let me hear you whisper / That you love me too." *Id*. Curious, Helen opens a curtain and sees the Dolphin. "He is looking right back at her." As Helen scrubs the floor "[s]he glances out of the corner of her eye … and notices the Dolphin is looking at her. She pretends to look away and sings Let Me Call You Sweetheart … but her eyes return to" him, "still looking at her." She coyly "play[s] peek-a-boo with the Dolphin" who reacts with an exotic aquatic sound: "Youuuuuuuuuu," showing his distinct ***recognition*** of Helen. *Id*. at 10. The scene ends with the same four lines of the love song. *Id*. at 12.

The next night, Helen arrives, looks around to ensure she is unnoticed, and wheels her equipment into the Dolphin lab. The Dolphin intently looks at her again. While Helen cleans, "[t]he thought of the Dolphin amuses her," and, smiling, "she starts humming the love song and scrubs [the floor] to the rhythm of it." *Id*. at 13. Noticing how "sad" he seems, she "looks directly in the Dolphin's face" and "touches the top of his head. He squirms and likes it." After scrubbing for a minute, she can't resist fully stroking the Dolphin. "This time he reacts even more enthusiastically. She is half-afraid and half-happy." *Id*. at 14. He emits gleeful noises, until they are abruptly interrupted by Moray's entrance. She tells Helen, "[dolphins] have an intelligence equal to our own … if we teach them our language – or learn theirs – we'll be able to communicate." As to the experiments, Moray lectures Helen on the sacrifices made in the name of "progress" which "you have to accept on faith." After she leaves, the Dolphin ***speaks***: "Whisper … Whisper to me." Danielle barges in with a laundry cart: "I sat down at the docks. You can see the moon in the river." *Id*. at 15.

When Helen and the Dolphin are finally alone, the romantic record plays again. The Dolphin stares at her "intensely," and she offers him food from her lunch bag, but "[t]he Dolphin moves and startles her." *Id*. at 16. Helen reaches into the tank: "I wouldn't hurt you. You know that." *Id*. at 17. They begin to form a close tender bond.

Moray enters, and dialogue establishes that Helen lives alone and is "used to … being alone." Helen is shocked to learn the Dolphin will *soon* be killed, as studying it alive has not yielded results. Moray is concerned that Helen has "apparently grown fond of the mammal." Once alone, the Dolphin stares at Helen in desperation. *Id*. at 18.

With the clock ticking down suspensefully to the Dolphin's death, a distraught Helen defends him to Moray: "Maybe he's mute … Some human beings are mute … we don't kill them." *Id*. at 19-20. She rushes to the Dolphin, the lab lit by "moonlight," and begs him to save himself by cooperating. He repeats: "Boooooooook." *Id.* at 20. Helen frantically enlists Danielle's help, who reluctantly agrees ("I'll try . . . Can't spend time looking for what ain't any of my business"). *Id.* at 21. Helen pleads to Moray who tries to calm her by speaking of a cat she was fond of; Helen asks if it was decapitated. Moray interjects that "lady fingers" will be served, noting the "macabre" name. Moray tells Helen that the facility performs "vivisection," and when Helen asks "What good is vivisection?" Moray describes how understanding *dolphins* will benefit man. *Id.* at 22. A vivid underwater fantasy of Helen's depicts (via film projection) idyllic coexistence with dolphins. *Id*. The Dolphin excitedly repeats "Boooooooook" and "Hate" to Helen, who rifles through files furtively provided by Danielle and finds out the Dolphin is being studied for *military* use. *Id*. at 24-25. A second Helen fantasy ensues, about the sinister use of dolphins and nuclear annihilation. Helen realizes this is why the remarkable Dolphin will not cooperate with the scientists. *Id*. at 25-26.

To save the Dolphin, Helen embarks on a plan to wheel him out of the facility in her laundry cart and free him at the docks in "the river … to the sea!" *Id*. at 27. Moray cannot find Helen but sees her coat, still in her locker. She goes to the lab and opens the curtain to reveal "Helen with her arms around the front part of the Dolphin," lifting him. Moray exclaims: "what do you think you're hugging?" *Id*. at 27-28. As Crocus fills a hypodermic syringe and his assistant sticks electrodes in the Dolphin, he emits pathetic distress signals. Helen, "[b]ursting into tears," runs to the elevator to leave. But we hear the record again: "Let me call you sweetheart, I'm in love with

you[.]" Helen, who until now has been seemingly compliant, "whirls around," marches back as Crocus is poised to inject the Dolphin, and lets loose: "Who the hell do you think you are? … I think you're murderers." "Being nice isn't any good. (*Looking at Dolphin*) They just kill you off . . . And that's being a coward. You gotta talk back against what's wrong . . . At least you gotta try." Crying, she turns to the Dolphin: "You're a coward." But as she leaves, he whispers "Loooooooooveeeeee," and repeats "Love." Stunned, the scientists abort the killing and direct Moray to get Helen. Moray protests, "That woman was hugging the mammal." Helen has a visual exchange of recognition with the Dolphin before departing and the elevator doors close. *Id*. 30-31.

### B.   Defendants' Film, *The Shape of Water*

The Film opens with an underwater fantasy scene leading to a submerged apartment. Film at 00:00-2:55. This is a dream of the protagonist, Elisa, who wakes up alone and goes through a precise and solitary daily routine. *Id.* at 2:55-5:10. Elisa has "keloid scars" on each side of her neck. Dkt. 49, Ex. 1 ("Scrply") at 6. She visits her friend/neighbor Giles, a frustrated closeted gay artist, to whom Elisa signs because she is *mute*. *Id.* at 5:10-6:16. Elisa boards a bus late at night; she is "[a]lmost entirely alone and looks out the window with great longing." *Id.* at 7:53-8:05; Scrply at 6.

Elisa works the night shift as a janitorial cleaning lady at a large scientific facility in '60s Baltimore. *Id.* at 8:25-9:50. She is friends with Zelda, a chatty co-worker. They learn the facility has received an amphibious Creature captured in South America by Strickland, an efficient, imperious government figure who carries an electric cattle prod. *Id.* at 10:10-12:00, 20:40-21:15. He is condescending and self-righteous to Elisa/ Zelda. *Id.* at 16:45-17:54; 26:20-29:15. Hoffstetler, a conscientious scientist, studies the Creature. Later, Strickland staggers from the lab with a bloody hand, and Elisa finds his two severed fingers in the lab. *Id.* at 18:40-20:25. Once alone in the lab, Elisa looks inside a glass tank. The Creature reveals himself, staring at her. When others enter the lab and he retreats. The next night, Elisa, ensuring she is unnoticed, pushes her equipment into the lab, where the Creature is now in a pool. As

Elisa peels an egg from her lunch bag, the Creature's head emerges – the two stare at each other, and she gives him the egg. A phone call between Strickland and General Hoyt reveals that **the military** have a special interest in the Creature. *Id.* at 29:20.

The next evening Elisa feeds the Creature eggs, and plays a romantic song from a ***1940's musical film*** on a record player. The Creature reacts favorably, and again the two stare at each other. Elisa revisits the Creature, plays a new record and with a smile mops to the rhythm of the music while the Creature watches. Elisa puts her hand to the tank and the Creature puts his "against" hers. Unbeknownst to Elisa, Hoffstetler watches this communication with amazement. *Id.* at 34:34-35:19. It is soon revealed that Hoffstetler, though a dedicated scientist, is also a Soviet spy. *Id.* at 35:17-38:18.

When Elisa next enters the lab, the Creature is chained and whimpering. While Elisa hides, Strickland enters and shocks the Creature to prompt a response ("You hurting? . . . maybe you're angry?"), but the Creature does not reveal his powers. Hoyt enters and reveals his Cold War objective ("Soviets want it" and they put "missiles in Cuba"). Strickland responds, "we have to vivisect this thing. Take it apart. Learn how it works." *Id.* at 43:10. Over Hoffstetler's heartfelt objections, Hoyt decides: "Crack the damn thing open." *Id*. at 44:50. Elisa begs Giles to help free the Creature. He refuses, but then changes his mind. Hoffstetler, ordered as well by his Soviet boss to kill the Creature, readies a hypodermic syringe to inject it. *Id.* at 45:02-59:00.

Elisa/Giles embark on a plan to free the Creature. As tension mounts, Hoffstetler helps Elisa unshackle the Creature, and she lifts him into her laundry cart. Zelda, though initially reluctant, also comes to Elisa's aid. Strickland checks the lab – the Creature is missing, as Elisa/Giles drive off with him. Elisa hides him in her bathtub, and plans to soon release him at the dock on a river canal that opens to the Atlantic. *Id.* at 1:07:40-1:11:10. When Giles discovers the Creature has decapitated his cat, the startled Creature slashes Giles' arm, but later humbly places his hand on Giles' wound and bald head. The next day Giles' wounds have healed and his hair is regrowing. *Id*. at 1:16:12-1:32:43. Elisa and the Creature consummate their relationship by having

sex. Elisa fantasizes a song-and-dance number performed by her and the Creature, in the style of the vintage musical songs played in the lab, singing "You'll never know just how much I love you, you'll never know how much I care." *Id.* at 1:38:05-1:40:59.

Strickland grows increasingly unhinged. He uncovers Elisa's plot by torturing Hoffstetler and threatening Zelda in front of her husband, who gives up Elisa. Strickland searches Elisa's apartment, discovering a note revealing that she is taking the Creature to the docks. *Id.* at 1:34:48-1:52:02. There, Strickland shoots Elisa and the Creature. The Creature heals himself and slashes Strickland's throat. As Zelda arrives with the police, the Creature takes Elisa and jumps into the water. Underwater, the Creature kisses her, bringing her back to life. When he touches her neck scars, they open as gills allowing her to breathe, and they embrace. *Id.* at 1:52:36-1:57:54.

The Film is very well acted and directed, and indeed garnered Academy Awards. However, that is legally irrelevant to an objective analysis under the extrinsic test.

## III.   ARGUMENT

### A.   Rule 12(b)(6) Should Not Be Abused To Dismiss Copyright Cases Based on Subjective Opinion, Usurping the Role of the Fact Finder.

Copyright infringement defendants have in recent years advanced a distorted legal framework that would essentially eliminate liability except in cases of literal duplication. Under the guise of the objective "extrinsic test," Defendants cherry-pick the harshest case language to urge dismissal ***on the pleadings*** without the benefit of any discovery and/or expert opinion.[2] *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) ("extrinsic test often requires . . . expert testimony"); *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994) (expert testimony "helpful" to "extrinsic prong"); *Shaw v. Lindheim*, 919 F.2d 1353, 1357-58

---

[2] Defendants pervasively rely on cases decided on summary judgment. *See* Mtn. at 10-16 (citing *Cavalier v. Random House, Inc.*, 297 F.3d 815 (9th Cir. 2002); *Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072 (9th Cir. 2006); *Berkic v. Chrichton*, 761 F.2d 1289 (9th Cir. 1985); *Benay v. Warner Bros. Emtnt.*, 607 F.3d 620 (9th Cir. 2010); *Buggs v. Dreamworks, Inc.*, 2010 WL 5790251 (C.D. Cal. Dec. 28, 2010).

(9th Cir. 1990) ("***expert's analysis reveals substantial similarities***" and "illustrates how the plots . . . share a common sequence and rhythm," precluding summary judgment) (emph. added); *Green v. MGM Studios, Inc.*, No. CV-08-2376, 2008 WL 11338272, at *3 (C.D. Cal. Nov. 24, 2008) (Anderson, J.) (expert evidence that extrinsic elements of script and film were substantially similar "create a genuine issue of fact"). The benefits of expert analysis are particularly clear where, as here, a court must compare a stage play in print to a fully realized film, and consider the subtle interplay of literary and visual elements, an already difficult and subjective inquiry. Yet under Defendants' extreme reading of case law, ***any*** defendant can seek 12(b)(6) dismissal of a copyright claim, even if their work incorporates pervasive and highly unusual elements from plaintiff's work, to which they had ready access. To achieve this result, Defendants systematically distort the true legal framework that the Ninth Circuit carefully crafted over the years, ignoring several crucial principles.

**"No Reasonable Juror" Standard.** The Court may decide the issue of substantial similarity as a matter of law only if "no reasonable juror could find substantial similarity of ideas and expression[.]" *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004). *See L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 851 (9th Cir. 2012) (in light of similarities ***and*** differences, "there is a genuine dispute of material fact"; court cannot rule that "no reasonable juror could find . . . substantial similar[ity]"); *Unicolors, Inc. v. H&M Hennes & Mauritz LP*, No. CV-16-2322, 2016 WL 10646311, at *4 (C.D. Cal. Aug. 12, 2016) ("reasonable minds might answer differently th[is] touchstone question"); *Wilson v. The Walt Disney Company*, No. 14-cv-01441, 2014 WL 4477391, at *1 (N.D. Cal. July 30, 2014) (despite "differences", court could not conclude that "no reasonable juror could find substantial similarity"); *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1216 (11th Cir. 2000) (same).[3]

---

[3] The spontaneous outpouring on social media pointing out the Film's elements lifted from the Play rebuts the possibility that "no reasonable juror" could find substantial similarity. Cmplt. ¶ 53. Though Defendants dispute the relevance of that public outcry, their cited cases are inapposite. *Crane v. Poetic Prods. Ltd.*, 593 F. Supp. 2d 585, 597 (S.D.N.Y. 2009) (authors of "articles" "assumed that" one work was based on the

Unsurprisingly, it is the same stringent standard applicable to a directed verdict under FRCP 50. *See Kaseberg v. Conaco, LLC*, 260 F.3d 1229, 1235 (S.D. Cal. 2017).

This due process standard is doubly important because "[d]eterminations of substantial similarity of expression are subtle and complex[.]" *Baxter v. MCA, Inc.,* 812 F.2d 421, 424-25 (9th Cir. 1987) (if "reasonable minds could differ as to" substantial similarity, Court cannot render judgment as a matter of law.) As this issue entails subjective aesthetic analysis, even summary judgment is "not highly favored." *Kouf v. Walt Disney Pictures & Telev'n*, 16 F.3d 1042, 1045 n.3 (9th Cir. 1994); *Dillon v. NBCUniversal Media LLC*, No. CV-12-9728, 2013 WL 3581938, at *4 (C.D. Cal. June 18, 2013) ("Ninth Circuit has 'expressed a certain disfavor for summary judgment on questions of substantial similarity'"); *Atkins v. Fischer*, 331 F.3d 988, 995 (D.C. Cir. 2003) (substantial similarity "extremely close question of fact").

To abrogate this standard, defendants have lobbied courts, "with no factual record," to "substitute[] [their] own judgment" for the jury's, under the guise of the extrinsic test. *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1128 (9th Cir. 2018) (Owens, J., dissenting). But the Ninth Circuit has admonished that courts must resist the impulse to "ma[k]e a subjective determination" of similarity, usurping the role of the "reasonable juror[.]" *Shaw*, 919 F.2d at 1357. Thus, the question on a 12(b)(6) motion is whether there is "enough to demonstrate that a reasonable jury *could* find" the requisite similarity, not whether the court so finds. *Marchel Design, Inc. v. Best Master Enters., Inc.*, No. CV-08-3654, 2008 WL 4723113, at *3 (C.D. Cal. Oct. 23, 2008). *Accord Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329 n.5 (9th Cir. 1983) (in denying summary judgment, court "intimate[s] no opinion" on substantial similarity, "but state[s] only that reasonable minds could differ[.]").

---

other); *RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 567 (C.D. Cal. 2005) (industry insiders reportedly referred to defendant's TV show as a "rip-off" or other derogatory terms). In neither case was the evidence useful to determine whether a reasonable juror could find substantial similarity. Here, the unprompted, often detailed descriptions by ordinary audience members who will comprise the jury are a sobering reminder of what a "reasonable juror" may find after comparing the Play and Film.

1
2
3

**__Improper Reliance on Added Differences.__** Defendants urge the Court to follow a perilous path sure to lead to unfair results by focusing on ***different*** elements they added to their work. However, longstanding authority holds that:

4
5
6
7

> "It is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown. . . . [T]he defendant will not be immunized from liability by reason of the addition in his work of different characters or additional and varied incidents, nor generally by reason of his work proving more attractive or saleable than the plaintiff's."

8
9
10
11

4 *Nimmer on Copyright* § 13.03 at 13:67-68 (2009) (citing, *inter alia*, *Walt Disney Prods. v. Air Pirates,* 581 F.2d 751, 756 (9th Cir. 1978)). As Judge Hand famously put it, an infringer may not "excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936).

12
13
14
15
16
17
18
19
20
21
22

Thus, "[e]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important," the jury "may properly find substantial similarity." *Baxter,* 812 F.2d at 425. When Defendants invariably assert that their "entire work" contains substantial differences, "this argument ignores the ***fundamental notion that no bright line rule exists*** as to what quantum of similarity is permitted before crossing into the realm of substantial similarity." *Id.* (emph. added). *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 945 (10th Cir. 2002) (infringement "may not be excused merely because it is insubstantial with respect to the *infringing* work"). In a leading case, *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990), the Ninth Circuit held that, where "[a] comparison of the plots of both [works] reveals significant ***similarities and differences***," even summary judgment could not be granted. *Id.* at 1357 (emph. added).

23
24
25

Here, Defendants' proffered differences are doubly inappropriate, as they are shot through with "unprotected elements," *scènes à faire* and film clichés.[4] Mtn. at 15. *Dillon*, 2013 WL 3581938, at *6 ("stock elements" added to Defendants' work "play

26
27
28

---

[4] Thus, Defendants urge dismissal because the Play does not feature stock elements or social stereotypes: (i) violent, sadistic speechifying "primary villain" (Mtn. at 20); (ii) female lead's artistic gay-friend (*id.* at 6); (iii) smart-talking, full-figured work-friend (*id.* at 21); (iv) gruff General barking orders (*id.* at 8); (iv) Cold War competition/ paranoia (*id.* at 24); and (v) Soviet spies seeking U.S. military secrets (*id.* at 14, 18).

no role in the substantial similarity analysis"). Defendants insist that, as to similarity, the Court must "filter out" any alleged unprotected element of the ***Play***, but in arguing dissimilarity they liberally tout unprotected elements from the ***Film***. Mtn. at 12. If the Court considers Defendants' extraneous references to other films, aspects of the Creature that Defendants flaunt as "different" are glaringly lifted from *The Creature from the Black Lagoon* (1954), where a physically almost-identical aquatic creature captured in the Amazon is erotically attracted to an American woman.[5] Defendants thus urge a transparent double-standard, where unoriginal or stock elements not in the Play supposedly support dismissal, while the Play's purported generic elements, no matter how originally arranged, ***also*** support dismissal. They cannot have it both ways.

**"Selection or Arrangement" Standard.** Defendants also ignore the rule that the original "selection or arrangement" of allegedly unprotected elements itself supports substantial similarity. *Nimmer*, § 3.04 at 3:24-32. Defendants' one-sided statement of the law, where "unprotected elements" such as *scènes à faire* are ignored, reflects just half the standard. Mtn. at 15. Under the full analysis, "a *combination* of unprotectable elements may qualify for copyright protection." *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003). Thus, "[t]he particular sequence in which an author strings a significant number of unprotectable elements can" satisfy the extrinsic test. *Metcalf v. Bochoco*, 294 F.3d 1069, 1073-74 (9th Cir. 2002). *See Three Boys Music*, 212 F.3d at 485 ("selection and arrangement" of unprotected elements supported substantial similarity); *Betty, Inc. v. PepsiCo, Inc.*, 283 F. Supp. 3d 154, 169 (S.D.N.Y. 2017) ("combination" of unprotected elements "protectable"); *Tufenkian Imp./Exp. Vent., Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003).

In ignoring such well-worn copyright principles, Defendants advance a skewed legal framework, under which most infringement would go unchecked.

---

[5] ***Splash!*** (1984) also ***undermines*** the originality of the Film elements that Defendants tout as different. Dkt. 32-5 at 34-36 (mermaid staying in hero's bathtub is captured by scientists, becomes sick and must return to ocean, and jumps off dock to escape with hero; with an underwater kiss, hero magically breathes so they can live together).

1    **B.    Defendants Cannot Evade Plaintiff's Allegations of Access.**

2    Proof of Defendants' access to a work requires "a reasonable opportunity" for

3    them to "view[] the [] work." *Three Boys Music*, 212 F.3d at 482. Access is shown by

4    "[c]ircumstantial evidence" of a "chain of events [] between the plaintiff's work and

5    [] defendant's" ***or*** where "the plaintiff's work has been ***widely disseminated*.**" *Id.*

6    (emph. added). Here, Plaintiff alleges that the Play, written by a Pulitzer Prize winner,

7    were widely disseminated via TV shows in 1969/1990 that were often rebroadcast,

8    1970/1973 print editions, at least ten anthologies, school curricula, public

9    performances, and reviews. Cmplt. ¶¶ 20-24. Plaintiff also alleges that facts regarding

10   the Film's development evince Defendants' knowledge of the Play. *Id.* ¶¶ 34-40. At

11   this stage, Defendants' access to the Play is established, since on a 12(b)(6) motion,

12   the "court must accept as true all material allegations in the complaint." *C&SM Int'l*

13   *v. Wholesale-fashionsquare.com, Inc.*, No. 2:18-cv-630, 2018 WL 2213453, at *2, 5

14   (May 14, 2018). *See Gay v. Facebook, Inc.*, No. 16-cv-3013, 2016 WL 10650825, at

15   *2 (N.D. Cal. Oct. 19, 2016) (allegation that "Facebook had access to source code"

16   accepted at 12(b)(6) stage; motion denied); *Dillon*, 2013 WL 3581938, at *7 (denying

17   12(b)(6) motion). Defendants do not dispute their access to the abridged Play, and

18   present no reason to question their access to the unabridged Play. Mtn. at 11, 21.

19   **C.    Objective Substantial Similarity Exceeds the Pleading Standard.**

20   **1.    "Inverse Ratio Rule" Lowers Required Showing of Similarity.**

21   Given the high degree of access alleged in the Complaint (¶¶ 20-25, 34-40) and

22   accepted as true, the degree of substantial similarity required to be shown is reduced

23   under the "'Inverse Ratio Rule[.]'" 2 *Nimmer on Copyright* § 143.4, at 634 (1967);

24   *DC Comics v. Towle*, 989 F. Supp. 2d 948, 961 (C.D. Cal. 2013). Under this rule, a

25   higher "degree of access justifies a lower standard of proof to show substantial

26   similarity." *Shaw*, 919 F.2d at 1361-62 (internal citations omitted); *Straughter v.*

27   *Raymond*, No. CV-08-2170, 2011 WL 3651350, at *13 (C.D. Cal. Aug. 19, 2011);

28   *Dillon*, 2013 WL 3581938, at *7 (denying 12(b)(6) motion). *See* Dkt. 50 at Part II.D.1.

2.      **Myriad Similarities Between the Play and Film Demonstrate That a Reasonable Juror Could Find Substantial Similarity.**

A fair comparison of the Play and Film's extrinsic elements annihilates Defendants' stance that there is "no" similarity as a matter of law. Mtn. at 13-14. Under the extrinsic test, the Court "looks to find specific, articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Swirsky*, 376 F.3d at 849 n.15. Substantial similarity is not required as to ***all*** these categories. *Shaw*, 919 F.2d at 1357-61 (denying ***summary judgment*** motion; genuine issues existed as to plot, dialogue, and some but not all characters); *Fleener v. Trinity Broad. Network*, 203 F. Supp. 2d 1142, 1150 (C.D. Cal. 2001) ("overlap of important plot developments combined with thematic and setting similarities" precluded ***summary judgment***); *Cabell v. Zorro Prods. Inc.*, No. 5:15-cv-771, 2017 WL 2335597, at *8 (N.D. Cal. May 30, 2017) (denying 12(b)(6) motion; "Plaintiff [] alleged sufficient facts [re: four extrinsic elements] to support" infringement).

Throughout, Defendants place undue emphasis on the inherent media differences between the Play – to be performed live on stage (with each scene playing to completion before the next), and the Film – employing camera movement and cross-cutting between locales and characters. However, that difference in ***presentation***, which is properly the subject of expert opinion, does not mask or dilute the array of substantial similarities between the Play and Film, particularly in their first two acts.

**Plot and Sequence.** Defendants badly misapply the extrinsic standard in trying to distinguish the works' plot and sequence of events. First, Defendants describe the Play only "at the highest level of generality" (Mtn. at 14), eliding its idiosyncratic plot points. Second, Defendants improperly invoke the Film's ***added*** elements, violating the principle that the extrinsic test analyses similarities, not differences. *Aeropostale*, 676 F.3d at 851. Despite these tactics, the similarities between the Play and Film are undeniable, such that a "reasonable juror could find" substantial similarity. *Id.*

The first two "Acts" of the Play/Film feature the following similar ***plot*** points

---

(among many others) in nearly the same *sequence*.[6] In the First Act: (i) the heroine, an unmarried janitorial cleaning woman (Helen/Elisa), arrives to work the graveyard shift at a large scientific facility in a city; (ii) she works alongside a garrulous, funny co-worker, under close supervision of an unctuous, condescending supervisor; (iii) in the first dramatic revelation, Helen/Elisa comes face-to-face with a highly-advanced aquatic creature, confined to a long glass case in a lab, and the two lock eyes, an early sign of preternatural closeness; (iv) Helen/Elisa knows the scientists are studying the creature, but does not yet know that they seek to exploit him for military use; (v) over the next few days, Helen/Elisa becomes increasingly drawn to the creature and emboldened to sneak into the lab to interact with him, though she knows it is prohibited and she may be caught; (vi) it is revealed that the creature can *communicate* in human language (spoken in the Play, signed in the Film), but does so *only* with Helen/Elisa; (vii) in one visit, Helen/Elisa feeds him food from her lunch bag; (viii) in another, she playfully cleans the floor to a 1940s musical number playing on a record player in the lab, while alternately smiling to herself, shooting the creature playful glances and moving to the music; (ix) romantic Hollywood music from the '40s repeatedly plays on the record player during her visits; (x) she tenderly touches the creature while they are alone; and (xi) she is shocked to learn that higher-ups have decided to kill the creature in just a few days, believing they can learn more by studying him while he dies and dissecting him. In the Second Act (xii) the creature's impending death acts as a "ticking clock" as Helen/Elisa becomes frantic to save him at all costs; (xiii) Helen/Elisa pleads for his life; (xiv) when she visits the lab, the creature sadly stares at her imploringly; (xv) she resolves to attempt a daring escape – to sneak him out of the facility in a large rolling laundry cart, and free him at nearby docks on a river that feeds into the Atlantic Ocean; (xvi) during the mounting suspense, it is noticed that

---

[6] Notably, Defendants sort the Film's plotting out of order (interspersing third-act elements throughout the copied portion of the story), creating the false impression that the first two acts of the Play/Film follow dissimilar sequencing. Mtn. at 14, 17-18.

Helen/Elisa has not left for the day but is nowhere to be found; (xvii) as the second act ends, she is discovered trying to free the creature, but (xviii) ultimately saves him.

Rather than confront these abundant plot elements, Defendants lump them together as a mere "basic concept" Mtn. at 15, misusing that term as a label for ***any*** specific element they wish the Court would not consider. However, "concrete" plot elements "extend[] beyond [a] basic idea," "[e]ven if none of the[] plot elements is remarkably unusual" – a standard easily met on the pleadings in this case. *Shaw*, 919 F.3d at 1362-63. *See also Lawrence Crane Ent., Inc. v. Abrams*, No. CV-11-7797, 2013 WL 12123997, at *6 (C.D. Cal. Jan. 28, 2013) (at 12(b)(6) stage, "Court is not convinced that the ideas and expressions in Plaintiffs' works are so intertwined" that they are unprotectable); *Tufenkian*, 338 F.3d at 134 ("when [the] numerous aesthetic decisions embodied in the plaintiff's" work "are considered in relation to one another," substantial similarity as to plot and sequence is established).

Defendants' references to third-party films are, of course, legally improper, as Courts may not "take[] judicial notice of other works within a genre" when analyzing extrinsic elements ***at the pleading stage***. *Silas v. HBO, Inc.*, 201 F. Supp. 3d 1158, 1170 (C.D. Cal. 2016). Moreover, those films (all but one of which post-date the Play) at best feature just one or two of the many similarities in the Play/Film.[7] In any event, it is "erroneous" to move for dismissal based on the argument that, "apparently, *every* expression this Court" might consider "may be generally . . . analogized to some other [] work" in the genre. *Fleener*, 203 F. Supp. 2d at 1148. *See Wolf v. Travolta*, 167 F. Supp. 3d 1077, 1091 (C.D. Cal. 2016) (genre tropes "do not pervade the entire work").

Defendants also abuse the *scènes à faire* doctrine in asserting that the works' parallel plots are "unprotectable" (without examples). Mtn. at 15. Elements are not *scènes à faire* unless they are "scenes which must be done," *Smart Inventions, Inc. v.*

---

[7] *Free Willy* (boy frees orca from park); *Starman* (man helps alien inhabiting human's body to return to spaceship, with military in pursuit); *Splash!* (*see* n.4 *supra*); *Project X* (man rescues chimpanzees trained in military flight simulators); *Day of the Dolphin* (male scientist tries to abort assassination plot using dolphins); *E.T.* (suburban boy befriends marooned alien and reunites him with his kind as military closes in).

*Allied Commc'ns Corp.*, 94 F. Supp. 2d 1060, 1067 (C.D. Cal. 2000), that is, "standard or indispensable elements of the [] genre." *Fleener*, 203 F. Supp. 2d at 1150. Defendants' effort to label the Play's peculiar elements *scènes à faire* "has no merit," given that the Play's "idea[s] . . . can be expressed in a myriad of ways," so no particular expression is standard. *Smart Inventions*, 94 F. Supp. 2d at 1070. "Defendants unsuccessfully battle [] the law and facts in attempting to reclassify *every* relied-upon concrete aspect of" the works as "standard[.]" *Fleener*, 203 F. Supp. 2d at 1150. *See Danjaq, LLC v. Universal City Studios, LLC*, No. CV-14-2527, 2014 WL 7882071, at *4 (C.D. Cal. Oct. 2, 2014) (rejecting 12(b)(6) argument that *James Bond* elements were "non-protectable . . . stock elements and scènes-à-faire" of spy films).

Defendants rely on *Benay v. Warner Bros.* but that case, decided on **summary judgment**, involved notably weaker similarities than here, as "both works are based on the same historical events" and person. 607 F.3d at 625, 629 (9th Cir. 2010). Given that real events, figures, and places are non-copyrightable, the court found insufficient evidence of substantial similarity **after fully considering expert opinions**. *Id.* at 629.[8] By contrast, the works here feature an abundance of protectable distinctive overlapping plot points. Even if the Court considered some elements "indispensable" to sci-fi/fantasy (a conclusion the Court should not make without expert opinion), the "selection, coordination, and arrangement of" those elements is sufficiently "[o]riginal" to preclude a 12(b)(6) motion. *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 849 (9th Cir. 2012); *Fleener*, 203 F. Supp. 2d at 1149-50 (same).

In *Metcalf v. Bochco*, for example, the Ninth Circuit rejected the same argument Defendants attempt here. There, the works featured overlapping plot elements – though not in the number or idiosyncratic detail as in this case. 294 F.3d at 1073-74. The Court **reversed** summary judgment, rejecting defendant's argument that "generic" similarities could not be considered under the "extrinsic test." Rather, "the presence

---

[8] *See also Funky Films, Inc. v. Time Warner Entmt. Co.*, 462 F.3d 1072, 1078-80 (9th Cir. 2006) (granting summary judgment because similarities between the works were confined to their **starting** "premises," from which they diverged into dissimilar plots).

of so many generic similarities and common patterns" are "articulable similarities" precluding summary judgment. *Id.* at 1074-75. *See Tufenkian*, 338 F.3d at 134 ("when numerous aesthetic decisions embodied in []plaintiff's work . . . are considered in relation to one another," substantial similarity as to plot and sequencing is established). Defendants utterly fail to confront such similar ***sequencing***, whereby the placement of each similar plot point has a similar dramatic, thematic, and character-building impact.

Defendants further try to evade the works' striking similarities by improperly citing plot items ***added*** to the Film, predominately in a post-escape third act. Mtn. at 17-18. But Defendants cannot avoid liability through "additional and varied incidents", where "similarity as to a substantial element of plaintiff's work can be shown." *Nimmer*, § 13.03. If "comparison of the plots of both works reveals significant similarities and differences," even summary judgment is ***error*** where, as here, "[d]espite these dissimilarities, the respective plots do parallel each other." *Shaw*, 919 F.2d at 1357-58. *See Danjaq,* 2014 WL 7882071, at *5 (denying 12(b)(6) motion); *Marchel Design*, 2008 WL 4723113, at *3 ("extrinsic test does not inquire as to whether there are *any* differences between [] works"); *Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 306-07 (S.D.N.Y. 2005) ("despite [plot] differences," court cannot "conclude that 'no reasonable trier of fact could find the works substantially similar'").

Finally, many alleged "differences" are not different at all. Defendants' position that the Film's creature is not studied for military use is absurd. Mtn. at 8. In the Film, a ***five-star general*** oversees the creature's study, repeatedly tying it to military advantage over the "Soviets." Film at 42:30. Similarly, contrary to Defendants' misreading, the Play's plot, like the Film's, is driven by the creature's pending "vivisection" (a rare medical term). Play at 22-23 (justifying "vivisection," Moray explains how understanding ***dolphins*** benefits man), 28 (scientists prepare to monitor creature's death via "encephalogram," indicating vivisection). Importantly, in both works, "vivisection" is announced in earshot of Helen/Elisa in an impersonal tone, which (a) dramatically contrasts with Helen/Elisa's anguish upon learning the

creature's fate, enhancing the sense of injustice; and (b) spurs her frantic efforts to save the creature. Play at 18; Film at 44:50. Defendants belabor the fact that Elisa's escape plan succeeds, but both Helen's and Elisa's plans are presented as hair-brained and improbable (and, indeed, Elisa's plan would have failed had Hoffstetler not interceded.) In exaggerating the Play's "differences," Defendants protest too much.

**Characters.** Shared character traits, such as those presented here, are frequently held to support a finding of substantial similarity. *E.g.*, *Sid & Marty Krofft Telev'n Prods., Inc. v. McDonald's Corp*, 562 F.2d 1157, 1169 (9th Cir. 1977); *Columbia Pictures Indus., Inc. v. Miramax Films Corp.*, 11 F. Supp. 2d 1179, 1182, 1190 (C.D. Cal. 1998); *Fleener*, 203 F. Supp. 2d at 1145-46.

As to the heroine Helen/Elisa, Defendants take the breathtakingly false stance that their ***sole*** similarity is "somewhat similar jobs[.]" Mtn. at 18. In reality, Helen/Elisa: (i) is an unmarried janitorial cleaning woman who lives alone; (ii) works graveyard shift at a lab facility, where she is condescended to as a low-ranking employee; (iii) is quiet (in Elisa's case, mute); (iv) wears a headscarf/overcoat, suggesting a humble appearance; (v) is a lonesome outsider and yearns for a partner;[9] (vi) is conscientious and finds comfort in orderly daily routines; (vii) is empathetic and drawn to the creature, to whom she feels a deep, personal connection; (vii) is the only one able to communicate with him; (ix) is sensitive; (x) likes vintage music; (xi) reveals a flirtatious side, previously subverted, when alone with him; (xii) has vivid fantasies; (xii) though seemingly compliant, is rebellious; (xiii) stands up to her "superiors"; and (xiv) finds the courage to try to save the creature against all odds.

Defendants again misapply the extrinsic test by largely ignoring these similarities and pointing to traits added to the Film. Mtn. at 19. As discussed above,

---

[9] It is incorrect that Elisa is not lonesome just because she is friends with a chatty co-worker and lonely neighbor. Elisa/Helen's isolation is precisely what draws her to the isolated creature. Scrply at 6 (Elisa, alone, looks out window "with great longing"); Play at 9. Moreover, the Book, co-written by Del Toro (the Film's director/co-writer) expressly depicts Elisa as lonely. *See* Dkt. 50 at 15 (citing Book at 6, 10, 133).

"additional" elements cannot overcome substantial similarity as a matter of law. *Nimmer*, § 13.03. Worse, Defendants cite purported "differences" that essentially do not exist. Whereas Defendants dub Elisa "the catalyst for change" (Mtn. at 19), the same is true of Helen, who sheds her seemingly compliant personality to uncover the facility's covert military objectives and free the creature, ultimately saving him. It is not significant that in the Play the creature initially suggests the escape (***in a laundry cart***); what is significant is that Helen stands up to take the risk of pursuing it. Further, the Film's last scene where Elisa breathes underwater does not transform her ***character*** into "not quite 'human.'" Mtn. at 19. Elisa's scars are "keloid" (Scrply at 2, Book at 6), meaning caused by cutting, so it is a stretch for Defendants to call them "incipient gills." Mtn. at 19. Under an objective view of the Film's last scene, the creature transforms Elisa's scars into gills, consistent with his other magic powers shown in the third act. This fantastical addition does not retroactively erase the abundant similarities of Helen/Elisa character traits and arcs in the Play's/Film's first two acts.

Likewise, the creatures in the Play/Film share substantial, unique qualities. Both (i) are amphibious male creatures that do not exist in the real world (*i.e.*, a dolphin who speaks English); (ii) make haunting dolphin-like sounds[10]; (iii) move similarly in the water[11]; (iv) despite differences in appearance, have similar physical and physiological traits[12]; (v) possess an emotional/moral intelligence superior to humans; (vi) can communicate with humans in human language;[13] (vii) but are adverse to

---

[10] The Film's supervising sound editor publicly stated that he "used those ***dolphin-like*** noises as initial inspiration" for the creature's vocalizations. Cmplt. ¶ 46.

[11] The Film's visual effects supervisor who works under Del Toro has publicly stated that he relied on footage of ***a dolphin*** for the creature's movement. *Id.*

[12] Both have dorsal fins (Film at 25:17); emit dolphin-like sounds (Play at 10; Film at 33:08); breathe air and require high water salinity (odd, given that the Film creature is from the freshwater Amazon) (Play at 17; Film at 1:02:32); and are fed raw fish (Play at 16; Film at 35:09). The comparison of Defendants' creature to a dolphin is made explicit in the Book. *See* Dkt. 50 at 18 (*citing* Book at 11-12, 92, 126, 143, 258).

[13] Defendants wrongly argue that the creature signs with Elisa because only ***she*** communicates with him. Mtn. at 17. Strickland talks to the creature seeking a reaction, Film at 40:07, and Hoffstetler studies the creature closely, convinced it can "communicate." *Id.* at 37:30. Yet the creature does so only with Elisa, as in the Play.

---

interacting with humans who study them for military use; (viii) is said to "hate[]" mankind (Play at 25; Scrply at 64); but (ix) unexpectedly recognize one lonesome female human as a kindred soul; (x) stare intently into her eyes; and (xi) are able to feel real love for  her. Once again, Defendants refuse to confront these explicit similarities, which drive the plots of both works, and cite only additional traits in their Film (the creature's sexual relationship with Elisa, ability to fight and cure injuries/baldness) that, again, appear almost entirely in its third act.[14] Mtn. at 19-20. Defendants cannot avoid liability, however, merely by adding characteristics. *Danjaq*, 2014 WL 7882071, at \*3-4 (despite "many differences between [main] characters" similarities precluded dismissal); *DC Comics v. Towle*, 802 F.3d 1012, 1025 (9th Cir. 2015) ("[w]e reject th[e] argument" that substantial similarity is not shown because film "versions of the [character] look substantially different"); *Spry Fox LLC v. LOLApps Inc.*, No. 2:12-cv-147, 2012 WL 5290158, at \*6 (W.D. Wash. Sept. 18, 2012) (cannot avoid liability by "making [e.g., *Gone with the Wind*'s Rhett Butler] an Alaskan goldminer instead of a southern gentleman").

The Film also appropriates other character traits in the Play and reassigns them among Film characters. For instance, Helen's co-worker, Danielle, is a garrulous, funny co-worker (who cleans, contrary to Defendants' position, *see* Play at 26-27) – a foil for the more reserved Helen, and, though reluctant at first to help Helen, comes to her aid. The Film gives Elisa a garrulous, funny co-worker (Zelda) who reluctantly helps Elisa escape with the creature. Danielle complains about her ex-husband, as Zelda complains about her husband. Play at 9, Film at 9:01. Like Dr. Crocus in the Play, the Film's Hoffstetler is a dedicated scientist, but he also serves to neatly

---

[14] Defendants' reliance on the Film's sexual scenes is overstated. Mtn. at 19. Del Toro and Kraus refer to **dolphin-human sex** in the Book (along with other dolphin references), creating an obvious parallel to the creature/Elisa's sexuality. Book at 11-12, 216. The Film even gives the creature retractable sexual anatomy just like a dolphin's, Film at 1:25:35-52. Moreover, dolphins, despite their alien appearance, are known to exhibit human behavioral, sexual and social conduct. Cmplt. ¶¶ 46-47.

articulate themes from the Play: he declares that the creature can indeed "communicate," is intelligent, and feels emotions, and insists, "this intricate beautiful thing [must not be] destroyed." Film at 37:30, 43:45, 1:00:54. Further, the key traits of the Play's antagonist, Moray (anxious, brown-nosing, pontificating, condescending supervisor-antagonist) are assigned to two Film characters: Fleming (anxious, brown-nosing supervisor) and Strickland (condescending, pontificating antagonist).

Defendants are wrong to suggest that because secondary characters are added in the Film or are not exactly parallel, such differences merit dismissal. Mtn. at 20-21. In the Ninth Circuit the addition or subtraction of characters "is not of major significance when considering both stories in their entirety". *Shaw*, 919 F.2d at 1357.[15]

**Themes.** Defendants misinterpret the Play's themes. The dominant themes in the Play/Film are: (i) the power of love over hate, divisiveness and violence; (ii) the triumph of empathy and communication over fear and authority; (iii) the supremacy of individuality over conformity; (iv) real advancement is impossible without an open mind; (v) one must look beyond appearance and status to a person's true character; (vi) our false view of "progress" neglects genuine progress of the human condition; and (vii) one must stand up against what is wrong, no matter one's station in life. Sub-themes are similar as well, including: (a) war is the product of fear, ignorance and a failure to communicate; (b) cruelty against innocent creatures in the name of science is wrong; (c) we tend to destroy what we don't understand; (d) music has an emotional power, facilitating communication; (e) people, though marginalized in society, can be remarkable. These shared themes are important because they reflect the net dramatic effect of other interrelated extrinsic elements like plot sequencing and character arcs.

Strikingly, Defendants' list of themes supposedly unique to the Film are equally

---

[15] *See also Krofft*, 562 F.2d at 1166-67 (infringers do not avoid liability by inserting different "features[] and mannerisms" among characters); *Wilson*, 2014 WL 4477391, at *2 (despite character differences, the works "enjoy a parallelism" precluding dismissal); *Betty*, 283 F. Supp. 3d at 169 (commercial may be substantially similar to script, although characters, and other elements, "are different"); *Gal*, 403 F. Supp. 2d at 307 (differences in characters, among other elements, did not merit dismissal).

present in the Play: "the power of friendship, the fluid nature of love, the power of music," and "unexpected soulmates," Mtn. at 22. Moreover, as Defendants cannot avoid liability (least of all at this stage) by adding to their work, it is not material that the Film conveys new sub-themes, like "toxic masculinity[.]" Mtn. at 22. Defendants' **_subjective_** misreading of the Play's themes confirms that substantial similarity cannot be decided here as a matter of law, without the benefit of real expert analysis.

**Mood/Pace.** The mood of both works is: (i) fantastical, due to Helen/Elisa's interactions with the supernatural creature **_and_** vivid fantasy sequences (including underwater); (ii) dreamy and tender, due to Helen/Elisa's relationship with the creature, their constant gazing at one another, and the use of romantic 1940s music; (iii) sinister and suspenseful, due to the creature's military use, the risk that Helen/ Elisa will be caught interacting with him, and the "ticking clock" that the creature will soon be killed; (iv) frantic and hopeless; but finally (v) triumphant. Given the threat of a futile death in the Play, and its macabre references to mammal experiments, Defendants can hardly distinguish the Film's mood as "adult and complex." Mtn. at 24. The Play is not a "children's" story (Mtn. at 24): the Play's appearance in mainstream sci-fi anthologies and on television, reflects its broad-based audience. Cmplt. ¶¶ 20-21, 23-24. The new mood added to the Film arises again in its third act, where "eroticism" is introduced. *Id.* But "[m]agic realism" (*i.e.*, the fantastic depicted as real), "high tension," and "an undercurrent of darkness" pervade the Play, where a miraculous dolphin of superior intellect/morality speaks English, only to a cleaning lady he grows to love, and she resolves to rescue him from a pointless death. *Id.*

Similarities in **_pacing_** are also substantial: the Play/Film's first two acts unfold over approximately the same weeklong period, with revelations and suspense beats arising at similar intervals.[16] Defendants cannot distinguish the works' pace by relying

---

[16] *E.g.*, Helen/Elisa's first encounter with the creature, the lyrical rhythm of Helen/Elisa's repeated forays into the lab, the revelation that the scientists will exploit the creature for military use (Helen discovers the "book"; Elisa overhears the General), and the "ticking clock" of the creature's imminent destruction.

on the Film's use of film techniques (*e.g.*, cross-cutting), Mtn. at 24; that difference in ***presentation***, due to differing media, does not change the fact that the ***story*** beats of the works' first two acts correspond at a similar pace over the same period.

**<u>Dialogue.</u>** The Film features dialogue substantially similar to the Play's. *E.g.*: Play at 20 (Helen: "Some human beings are mute, you know. Just because they can't talk we don't kill them"), Film at 47:00 (Elisa: "I move my mouth, like him, and I make no sound, like him. What does that make me?"); Play at 30 (Helen: "You gotta talk back against what's wrong or you can't ever stop it. At least you gotta try"), Film at 47:33 (Elisa: "I can either save him now or let him die," Giles: "What can we do, nothing," Elisa: "If we don't do something . . . Neither are we."); Play at 15 (Moray, Play's antagonist: "You will do your best not to become fond of the subject animals"), Film at 1:01:03 (Strickland, Film's antagonist, admonishes not to "fall in love with [] playthings," "this isn't a petting zoo"); Play at 15, 17 ("we'll be able to communicate" with creature, "Helen knows you talk. You do talk to Helen, don't you?"), Film at 37:30, 1:00:54 ("I think [creature] may be able to communicate . . . with us," "creature is [] capable of language"); Play at 15 (creature "may have an intelligence equal to our own"), Film at 37:38, 1:00:54 ("I have reason to believe it is intelligent," "This creature is intelligent"); Play at 8 (Moray, in response to Helen's curiosity: "[D]on't worry about anything except the floor . . . [do] not to touch either the equipment or animals"), Film at 28:15 (Strickland to Helen: "[L]emme say this upfront. You clean that lab. You get out."); Play at 22 (Moray: creature will undergo "vivisection"), Film at 43:28 (Strickland: "we have to vivisect this thing. Take it apart."); Play at 24 ("saw through the skull"); Film at 44:50 ("[c]rack the damn thing open").

The above dialogue conveying the same sentiment for the same purpose goes beyond "a few . . . *words*," as Defendants mischaracterize.[17] Mtn. at 22. Defendants

---

[17] The presence of the exact same words/phrases, used for the same purposes, only confirms the extent of similarity. Cmplt. ¶ 43 at M, N, BB, CC, DD, QQ, TT, ZZ. For example, although "vivisect[ion]" is one word, it is a very unusual scientific term connoting an entire process that both works use to advance their plots and themes.

flagrantly misapply *Olson v. NBC*, 855 F.2d 1446 (9th Cir. 1988), Mtn. at 22. The *Olson* Court required "extended similarity of dialogue" only because **no** other extrinsic element was shared by the works. Here, Plaintiff shows abundant similarities within each analytical category. *E.g.*, *Cabell*, 2017 WL 2335597, at *8 (substantial similarity based on extrinsic elements other than dialogue); *Metcalf*, 294 F.3d at 1073-74 (same).

**Setting.** The setting for the central story of the Play/Film's first two acts is substantially similar: (i) a large, multi-level facility[18] devoted to scientific research, which includes (ii) a scientific laboratory for studying the creature, with a long glass water tank holding him; (iii) a larger pool where he swims at the scientists' discretion; (iv) corridor(s) which leads to an elevator that transport characters on and off the floor where the creature is housed, and (v) a locker room. Both facilities are located in East Coast cities (Manhattan/Baltimore) and, critically, near docks on rivers that flow to the Atlantic. Outwardly, neither presents itself as for military use, but its military purpose is revealed after Helen/Elisa starts to bond with the creature. Defendants cannot dilute such fundamental similarities by pointing to settings added to the Film. A stage play (particularly a low-budget play) by its nature depicts fewer physical settings, while evoking a broader world through plot/dialogue, whereas a film visually shows other settings from that broader world. But those extra settings shown in the Film (*e.g.*, certain characters' apartments, transitional settings such as the bus and the dock/river itself) exist primarily to support the core story shared by the Play/Film.

**Totality of Similarities.** "[T]he totality of the similarities" across the extrinsic factors "goes beyond the necessities of the" works' general ideas, and "extends to elements of protected expression[.]" *Shaw*, 919 F.2d at 1363. *Accord Metcalf*, 294 F.3d at 1074 ("cumulative weight" of similar elements precludes judgment as a matter of law under extrinsic test). Defendants' labeling these as "random similarities" is just another epithet, deployed to ignore the works' quite substantial similarity. Mtn. at 25.

---

[18] Defendants misleadingly call the facility in the Play "small" (Mtn. at 22) when in fact it takes up most or all of a tall New York high-rise, and includes a "natatorium" (indoor swimming pool). Play at 8, 11, 24, 27 (refers to activity on floors 5-9, 10, 18).

### D.     Under Defendants' Standard, Copycats Could Infringe Their Film.

Imagine if a rival company released a film about a cleaning woman at an urban scientific facility who encountered an otherworldly aquatic creature being studied in a lab for military purposes, developed a deep connection with him, bonded with him while playfully moving to 1940s Hollywood music on a record player, and then, when she learned that scientists intended to vivisect the creature to study him, vowed to free him in her laundry hamper and release him at a river dock leading to the sea. Defendants would not stand still for such infringement. Yet under their version of the extrinsic test, the copycat producer could prevail by asserting that Defendants' Film was *The Creature from the Black Lagoon* meets *Beauty and the Beast*, and that the Film's elements were  simply "basic plot ideas" or "situations and incidents that flow necessarily or naturally from" its premise. Mtn. at 12.

Of course, the extrinsic test cannot be so elastic that defendants can twist it to characterize ***any*** similar series of elements as "unprotected." And so, when the studios come to court to enjoin infringing films, they noticeably rediscover the Ninth Circuit's standards for copyright pleading, which ensure that colorable infringement cases survive. *See MGM, Inc. v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1293 (C.D. Cal. 1995) (preliminary injunction granted MGM re: alleged infringement of *James Bond* character/films); *Towle*, 989 F. Supp. 2d at 969-71 (Batmobile is a protectable "character"; granting summary judgment to ***plaintiff*** DC); *Columbia Pictures Indus., Inc. v. Miramax Films Corp.*, 11 F. Supp. 2d 1179, 1190 (C.D. Cal. 1998) (enjoining film posters and trailers). The same fair standard should apply to Plaintiff's case.

## IV.     <u>CONCLUSION</u>

Based on the foregoing, Film Defendants' Motion should be denied.

Dated: June 4, 2018                    TOBEROFF & ASSOCIATES, P.C.

By: _____*/s/ Marc Toberoff*_____
                                 Marc Toberoff

Attorneys for Plaintiff David Zindel