JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Kamilla Sali-Suleyman | N/A | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**     IN CHAMBERS – COURT ORDER

        Before the Court are Motions to Dismiss filed by defendants Fox Searchlight Pictures, Inc., Twentieth Century Fox Film Corporation, TSG Entertainment Finance LLC, Guillermo del Toro, Daniel Kraus (collectively, "Film Defendants") (Docket No. 29) and MacMillan Publishing Group, LLC ("MacMillian") (collectively, "Defendants") (Docket No. 31). Plaintiff David Zindel ("Plaintiff") has filed oppositions to both motions (Opp'n to Film Defs.' Mot., Docket No. 46; Opp'n to Macmillan's Mot., Docket No. 50), and Defendants have filed replies (Film Defs.' Reply, Docket No. 55; Macmillan's Reply, Docket No. 52). Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds these matters appropriate for decision without oral argument. The hearings calendared for July 9, 2018, are vacated, and the matters taken off calendar.

## I.    Background

        Plaintiff alleges that Defendants infringed copyrights in the play Let Me Hear You Whisper (the "Play") with the film The Shape of Water (the "Film") and a novelization of that film (the "Book").

        According to the complaint, Paul Zindel ("Zindel") was a Pulitzer Prize-winning playwright who wrote multiple books, plays, teleplays, and screenplays, some of which were developed for film and television. (Compl. ¶¶ 19, 26, Docket No. 1.) Zindel wrote the Play in or about 1969, and since then it has been widely read and performed, twice adapted into television productions broadcast nationwide, taught in American schools, and staged in live productions. (Id. ¶¶ 3, 20-21, 23-25.)[1] The Play also has been published in at least ten print editions, including a slightly abridged version published by Scholastic Voice in 1970 and an unabridged version published by Dramatists Play Service Inc. in 1973. (Id. ¶¶ 3, 23-25.) The abridged version of the Play was registered with the Copyright Office on May 22, 1970. (Compl. ¶ 28; see Compl. Ex. A, Docket No. 1-1.)

---

[1]     Plaintiff is Zindel's son and the trustee of two trusts that own the interests in Zindel's literary works. (Compl. ¶¶ 10, 19, 27.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

The Film premiered at the Venice Film Festival on or about August 31, 2017, and was released theatrically on or about December 1, 2017. (Compl. ¶ 30.) Fox Searchlight served as the production company and distributor; Twentieth Century Fox co-financed and distributed the Film; TSG co-financed the Film; del Toro wrote, directed, and produced the Film; and Kraus was an associate producer and contributed to the Film's story and screenplay. (Id.) The Film has been the subject of critical praise since its release and has been a box-office success. (Id. ¶¶ 51-52.)

Kraus and del Toro also wrote a novelization of the Film (the Book), which Macmillan intended to publish on or about March 6, 2018. (Compl. ¶ 41.) Plaintiff alleges that because "the [Book] reflects a substantial portion of the story, elements, characters and themes depicted in the [Film], . . . the [Book] likewise constitutes a derivative work of the Play" and also violates the copyrights in the Play. (Id.)

Defendants did not seek a license to the Play and did not credit Zindel on the Film, even though the Film allegedly "tells a story that is substantially similar, and in many ways identical, to that of the Play." (Compl. ¶¶ 31-32.) The complaint alleges that the Play and the Film both tell the story of a lonely cleaning woman working at a laboratory that performs animal experiments for military purposes during the height of the Cold War. (Id. ¶¶ 22, 31.) The woman is quiet but has a talkative, humorous coworker who complains about her marriage. (Id.) At the facility, the woman discovers an aquatic creature of advanced intelligence confined to a glass tank with whom she begins a loving relationship. (Id.) The woman discovers that the creature can communicate but that it chooses to do so only with her. (Id.) When the woman learns that the creature is to be killed, she hatches a plan to sneak the creature out of the facility in a laundry cart and release it into the ocean. (Id.) The complaint goes on to list 61 points of alleged similarity between the Play and the Film. (Id. ¶¶ 43-44; see also id. ¶¶ 45-48.) The complaint also alleges that various individuals have recognized that the Film copies the story, elements, characters, and themes from the Play, and the complaint provides some comments found online as examples. (Id. ¶¶ 1-2, 53.)

Plaintiff filed his complaint on February 21, 2018, asserting claims of direct, contributory, and vicarious copyright infringement. Defendants filed their motions to dismiss on May 7, 2018.

## II.    Legal Standard

Generally, plaintiffs in federal court are required to give only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). While the Rules allow a court to dismiss a cause of action for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), they also require all pleadings to be "construed so as to do justice," Fed. R. Civ. P. 8(e). The purpose of Rule 8(a)(2) is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

However, in Twombly, the Supreme Court rejected the notion that "a wholly conclusory statement of [a] claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Twombly, 550 U.S. at 561 (second alteration in original) (quoting Conley). Instead, the Court adopted a "plausibility standard," in which the complaint must "raise a reasonable expectation that discovery will reveal evidence of [the alleged infraction]." Id. at 556. For a complaint to meet this standard, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure §1216, pp. 235-36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action")); see also Daniel v. County of Santa Barbara, 288 F.3d 375, 380 (9th Cir. 2002) ("All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." (quoting Burgert v. Lokelani Bernice Pauahi Bishop Tr., 200 F.3d 661, 663 (9th Cir. 2000))). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotation marks omitted). In construing the Twombly standard, the Supreme Court has advised that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

**III.     The Parties' Requests for Judicial Notice**

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007) (per curiam) (citing Jacobson v. Schwarzenegger, 357 F. Supp. 2d 1198, 1204 (C.D. Cal. 2004)). A court "may judicially notice a fact that is not subject to reasonable dispute because it" either (1) "is generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Civ. P. 201(b). Additionally, "under the 'incorporation by reference' doctrine, [courts may] take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading. [The Ninth Circuit has] extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (third alteration in original) (citations omitted) (some internal quotation marks omitted); see Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010).

JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

### A.    The Play, the Film, and the Book

Film Defendants request that the Court take judicial notice of the versions of the Play published by Scholastic Voice in 1970 and Dramatists Play Service Inc. in 1973 as well as the Film. The Film Defendants have provided copies of the Play and a DVD containing the Film. ("Film Defs.' RJN," Docket No. 39; see Docket No. 30; Strauss Decl., Docket No. 38; Strauss Decl. Exs. 1-3, Docket Nos. 38-1 to 38-3.) Macmillan requests that the Court take judicial notice of the same two versions of the Play as well as the Book, copies of which Macmillan has submitted. ("Macmillan's RJN," Docket No. Docket No. 32; see Freeman Decl. ¶¶ 2-4, Docket No. 32-1; Freeman Decl. Exs. 1-3, Docket Nos. 32-2, 32-3, 33.) Plaintiff has not opposed either request.

F        Plaintiff requests that the Court take judicial notice of a screenplay for the Film that Plaintiff's counsel obtained online. ("Pl.'s RJN," Docket No. 48; see Fretty Decl., Docket No. 49; Fretty Decl. Ex. 1, Docket No. 49-1.) The Court will not consider the screenplay. "[B]ecause published works cause injury under copyright law, courts consider the final version of a film, rather than unpublished scripts, when determining substantial similarity." Silas, 201 F. Supp. 3d at 1169 (citing Meta-Film Assocs., Inc. v. MCA, Inc., 586 F. Supp. 1346, 1360 (C.D. Cal. 1984); 4-13 Nimmer on Copyright § 13.03[B][1][b]); see Briggs v. Blomkamp, 70 F. Supp. 3d 1155, 1168 n.1 (N.D. Cal. 2014). The Court has been provided a copy of a DVD containing the Film itself, and that will provide the basis for the Court's infringement analysis. The Court also agrees with Film Defendants that the screenplay was not incorporated by reference into the complaint. Plaintiff's request for judicial notice of the screenplay is denied.

### B.    Facts and Common or Generic Elements of Works in the Genre

Macmillan also requests that the Court take judicial notice that "[s]cientists have attempted communication with dolphins and other mammals, and have claimed that mammals understand and are able to communicate." (See Macmillan's RJN at 1, 4-5.) Macmillan further requests that the Court take judicial notice of the following allegedly generic or common literary elements:

- Numerous expressive works depict scientists in a laboratory experimenting on animals or other creatures.
- Numerous expressive works depict scientists treating creatures that are the subject of their research dispassionately.
- In many expressive works depicting research on creatures, the concept of a compassionate non-scientific or non-governmental character who empathizes with the creature is common.
- Attachments between a human and a non-human (or not fully human) creature are frequently depicted in expressive works.

(Id. at 1-2, 5-10.) In support of its request, Macmillan has submitted various materials that its counsel found on the internet, including articles about scientists' attempts to communicate with dolphins as well

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

as summaries of films, books, and television shows depicting scientists experimenting on animals. (Freeman Decl. ¶¶ 5-9; Freeman Decl. Exs. 4-8, Docket Nos. 32-8 to 32-8.)

Plaintiff has objected to the website printouts and articles submitted by Macmillan, arguing that those materials are not appropriate subjects of judicial notice and that by submitting them, Macmillan is improperly attempting to convert its motion to dismiss into a motion for summary judgment. (See Pl.'s Opp'n to Macmillan's RJN.) Plaintiff also objects to Film Defendants' citation of similar materials on the same basis. (Id. at 1 n.2, 2-3 & n.3.)

"In the context of copyright cases, courts in the Central District have previously taken judicial notice of elements that are common to a given genre. However, courts have refused to take judicial notice of elements that are not 'generally known.'" Silas, 201 F. Supp. 3d at 1170 (citations omitted) (collecting cases). Moreover, the Ninth Circuit has cautioned that "[p]ursuant to Federal Rule of Evidence 201, [courts] may . . . take judicial notice of 'matters of public record' but not of facts that may be 'subject to reasonable dispute.' More specifically, [courts] may not, on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that could reasonably be disputed." United States v. Corinthian Coll., 655 F.3d 984, 999 (9th Cir. 2011) (citations omitted) (quoting and citing Lee v. City of Los Angeles, 250 F.3d 668, 689-90 (9th Cir. 2001)).

The Court will not take judicial notice of the fact and generic elements cited by Macmillan because it is not clear that they are generally known. See, e.g., Silas, 201 F. Supp. 3d at 1169-71 (denying request to take judicial notice of elements common to prior works because the elements "are not 'verified simply by watching television for any length of time,'" and denying request to take judicial notice of other works within a genre because the works are not generally known (quoting Zella v. E.W. Scripps Co., 529 F. Supp. 2d 1124, 1129 (C.D. Cal. 2007))); Dahl v. Toyota Motor Sales USA, Inc., No. 2:14-CV-1737 JCM (PAL), 2015 WL 1034342, at *3 (D. Nev. Mar. 10, 2015) (declining to take judicial notice of allegedly common and prevalent storyline, and explaining that copies of internet searches and website contents "do not conclusively establish that the storyline . . . is common and prevalent in public works" (internal quotation marks omitted)). Furthermore, the alleged fact and allegedly generic elements are not necessary for the Court's ruling on Macmillan's motion.

## IV.   Discussion

### A.   Direct Copyright Infringement

"A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Funky Films, Inc. v. Time Warner Entm't Co., L.P., 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)). "[T]he second element has two distinct components: 'copying' and 'unlawful appropriation.'" Rentmeester v. Nike, Inc., 883 F.3d 1111, 1117 (9th Cir. 2018) (citing Sid & Marty Krofft Television Prods., Inc. v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

McDonald's Corp., 562 F.2d 1157, 1164-65 (9th Cir. 1977); Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01[B]). "Proof of unlawful appropriation—that is, illicit copying—is necessary because copyright law does not forbid all copying. . . . [A] defendant incurs no liability if he copies only the 'ideas' or 'concepts' used in the plaintiff's work. To infringe, the defendant must also copy enough of the plaintiff's expression of those ideas or concepts to render the two works 'substantially similar.'" Id. (citing Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 913-14 (9th Cir. 2010)).

       1.    Determination of Noninfringement on a Motion to Dismiss

Defendants argue that Plaintiff's claims for direct infringement fail because their works (the Film and the Book) are not substantially similar to the Play. (Film Defs.' Mot. at 1-2; Macmillan's Mot. at 1; see Film Defs.' Mem. P. & A. at 13-25; Macmillan's Mem. P. & A. at 5-22, Docket No. 31.) Defendants contend that the Court may decide the issue of substantial similarity on a motion to dismiss (Film Defs.' Mem. P. & A. at 12-13; Film Defs.' Reply at 3; Macmillan's Mem. P. & A. at 2, 6-8; Macmillan's Reply at 2-4), while Plaintiff contends that the issue is fact-dependent and should be left to a jury (Opp'n to Film Defs.' Mot. at 7-9; Opp'n to Macmillan's Mot. at 2-4).

The Court agrees with Defendants that the issue is appropriate for resolution on a motion to dismiss. See Rentmeester, 883 F.3d at 1123; Christianson v. W. Publ'g Co., 149 F.2d 202, 203 (9th Cir. 1945). "In copyright infringement cases where the court judicially notices the works at issue and it is clear there is no substantial similarity between them as a matter of law, dismissal of the claims is proper." Gallagher, 2015 WL 12481504, at *2 (citing Christianson, 149 F.2d at 203; Wild v. NBC Universal, Inc., 513 F. App'x 640, 641 (9th Cir. 2013)).

       2.    Access to the Play and the Inverse-Ratio Rule

In his oppositions, Plaintiff argues that he has adequately alleged access and that he need not make as strong a showing of substantial similarity due to the "inverse-ratio" rule. (Opp'n to Film Defs.' Mot. at 12; Opp'n to Macmillan's Mot. at 7-8.) Defendants dispute that a showing of access permits a lower showing of similarity. (Film Defs.' Reply at 3-4; Macmillan's Reply at 4-5.)

The Court agrees with Defendants that regardless of the level of access that Plaintiff alleges, the level of similarity that must be shown does not change. "The inverse ratio rule provides that the stronger the evidence of access, the less compelling the similarities between the two works need be in order to give rise to an inference of copying." Rentmeester, 883 F.3d at 1124. However, the inverse-ratio rule "assists only in proving copying, not in proving unlawful appropriation . . . . The showing of substantial similarity necessary to prove unlawful appropriation does not vary with the degree of access the plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

has shown." Id.  Furthermore, "[e]ven if a defendant concedes use of a plaintiff's work, the copyright claim still fails absent substantial similarity." Zella, 529 F. Supp. 2d at 1133 (collecting cases).[2]

      3.    The Version of the Play at Issue

There is a dispute among the parties about which version of the Play is and should be at issue. However, the parties agree that the two versions of the Play are not materially different, and the Court finds that any differences between the two versions does not alter the Court's analysis.[3]

      4.    Substantial Similarity Analysis

"In assessing whether particular works are substantially similar, . . . [the Ninth] Circuit applies a two-part analysis: the extrinsic test and the intrinsic test." Unicolors, Inc. v. Urban Outfitters, Inc., 853 F.3d 980, 985 (9th Cir. 2017) (citing Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir. 2000)); see Rentmeester, 883 F.3d at 1118.  "The extrinsic test requires plaintiffs to show overlap of 'concrete elements based on objective criteria,' while the intrinsic test is subjective and asks 'whether the ordinary, reasonable person would find "the total concept and feel of the works" to be substantially similar.'" Unicolors, 853 F.3d at 985 (citation omitted) (quoting Three Boys Music Corp., 212 F.3d at 485; and then Pasillas v. McDonald's Corp., 927 F.2d 440, 442 (9th Cir. 1991)).  "At the pleadings stage, only the objective extrinsic test applies." Basile v. Twentieth Century Fox Film Corp., No. CV 14-4263 DMG (JPRx), 2014 WL 12521340, at *4 (C.D. Cal. Aug. 19, 2014) (citing Funky Films, 462 F.3d at 1077; Zella, 529 F. Supp. 2d at 1133); see Gallagher, 2015 WL 12481504, at *3.

"The extrinsic test assesses the objective similarities of the two works, focusing only on the protectable elements of the plaintiff's expression.  Before that comparison can be made, the court must 'filter out' the unprotectable elements of the plaintiff's work – primarily ideas and concepts, material in the public domain, and scènes à faire (stock or standard features that are commonly associated with the treatment of a given subject)." Rentmeester, 883 F.3d at 1118 (citations omitted) (citing Cavalier v. Random House, Inc., 297 F.3d 815, 822-23 (9th Cir. 2002)).  After filtering out the unprotectable elements, "[t]he protectable elements that remain are then compared to corresponding elements of the defendant's work to assess similarities in the objective details of the works." Id.  In cases such as this one, the extrinsic test "focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." Cavalier, 297 F.3d at 822 (quoting Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994)); see Benay, 607 F.3d at 624.

---

[2]      Thus, the Court need not consider whether Defendants had different levels of access to the different versions of the Play.  (See Film Defs.' Mot. at 1-2; Film Defs.' Mem. P. & A. at 11 n.7, 21.)

[3]      Unless otherwise stated, the Court's analysis is equally applicable to both versions of the Play, but for ease of reference, the Court cites only to the 1973 version.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

Because the Book tells the same story as the Film, the same infringement analysis applies to Film and the Book.  See Merrill v. Paramount Pictures Corp., No. CV 05-1150 SVW (MANx), 2005 WL 3955653, at *14 (C.D. Cal. Dec. 19, 2005) (stating that the court's substantial similarity analysis for an allegedly infringing film also applied to the film's novelization because its storyline was identical); see also Whitehead v. Paramount Pictures Corp., 53 F. Supp. 2d 38, 50 n.8 (D.D.C. 1999) (stating that the accused film and its novelization "are essentially identical and will be treated as one work for purposes of determining substantial similarity").  The Court's discussion of the Film applies equally to the Book, and the Court will only refer to the Book separately when necessary to highlight additional differences between the Book and the Play.

<u>Plot and Sequence of Events</u>

"In applying the extrinsic test, [courts] look 'beyond the vague, abstracted idea of a general plot.'"  Benay, 607 F.3d at 625 (quoting Berkic v. Crichton, 761 F.2d 1289, 1293 (9th Cir. 1985)). "[P]rotectable expression includes the specific details of an author's rendering of ideas, or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'"  Metcalf v. Bochco, 294 F.3d 1069, 1074 (9th Cir. 2002) (quoting Berkic, 761 F.2d at 1293).

The Play begins when Helen, the main character, begins working as a janitorial employee at a private research laboratory that conducts animal experiments.  Researchers are attempting to communicate with a dolphin, but the dolphin chooses to speak only to Helen.  Helen later discovers that the dolphin is refusing to speak in order to avoid being used as a weapon of war.  Over the course of a week, Helen grows increasingly troubled by the facility's animal experiments, which end in the deaths of the animals, but Helen's supervisor, Miss Moray, cautions Helen not to question the researchers' work. After Helen learns that the dolphin is to be killed and dissected, she is persuaded by the dolphin to help it escape from the facility in a laundry hamper.  However, the escape fails, and Miss Moray fires Helen. Helen speaks out against the treatment of the test animals, and she encourages the dolphin to speak to save its life.  As Helen is leaving, the dolphin speaks the word "love" for all to hear.  Dr. Crocus, the scientist testing the dolphin, instructs Miss Moray to go after Helen, but Helen refuses to stay.  Helen departs, and the dolphin remains in the laboratory.

The Film follows a janitorial employee, Elisa, who works at Occam Aerospace Research Center, a large secure government laboratory.  At the beginning of the Film, a unique, humanoid, amphibious creature is brought into Occam for analysis and testing.  Elisa begins secretly visiting the creature and develops a relationship with it.  However, Strickland, who oversees the creature's testing, decides that the creature must be killed.  When Elisa learns of this development, she enlists her neighbor and friend, Giles, to assist her, and she comes up with a plan to smuggle the creature out of Occam in a laundry cart. Along the way, Elisa is helped by her coworker and friend Zelda and by Dr. Dimitri Hoffstetler, an Occam scientist who is also a Russian spy.  The escape is successful, and Elisa takes the creature to her home.  Elisa keeps the creature in her bathtub for a few days until she can release it into the ocean.

JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

During this time the creature is found to possess magical powers, which it uses to heal a cut on Giles' arm and to cure Giles' baldness.  It is also during this period that Elisa's relationship with the creature becomes sexual.  Meanwhile, Strickland faces pressure from his superior, General Hoyt, to find the creature.  Strickland confronts Hoffstetler and Zelda and they confess that Elisa has the creature. Strickland goes to Elisa's apartment only to find it empty, but finds a clue where Elisa has taken the creature.  Strickland arrives at the dock just when Elisa and Giles are about to release the creature into the ocean.  Strickland then shoots the creature and Elisa.  The creature recovers, kills Strickland, and takes Elisa with it into the water.  Underwater, the creature revives Elisa from her seemingly fatal gunshot wound, and causes scars on her neck to open into gills.  It is implied that the two will live happily ever after.  The film also contains numerous subplots, including Russian agents trying to steal or kill the creature; Strickland's increasingly detached and violent behavior both at work and in his personal life; Giles's lack of success selling his art; and his failed courtship of a waiter at a local diner.

Although the Play and the Film share the basic premise of an employee at a scientific facility deciding to free a creature that is subjected to scientific experiments, that concept is too general to be protected.  See Cavalier, 297 F.3d at 8224.  The same is true for the detail that the employee is moved by the subject's impending death and the more basic idea of a person forming a connection with a non-human or animal.  Other similarities stem from those basic and unprotectable elements, such as those responsible for the testing not seeing their work as harmful or wrong.  There are some minor similarities in the two works' expressive choices, such as the fact that the main character is a janitorial worker, that the test subject is of interest for military purposes, and that the escape plan involves the use of a laundry cart.  However, the similarities generally end there.

The main character's relationship with the creature illustrates many of the differences between the works.  In the Play, Helen does not appear to develop a unique attachment to the dolphin.  Rather, Helen disapproves of animal testing, which leads to a desire to save the dolphin.  By contrast, Elisa's bond with the creature in the Film develops more slowly, growing into personal affection and then love. Whereas Helen simply speaks to the dolphin and once tried to give it a piece of her sandwich, Elisa treats the Film's creature as a friend and brings it eggs that she made for it.  Plaintiff contends that music plays a similar part in the works, but Elisa plays the creature records from her personal music collection as a form of connection while in the Play, scientists repeatedly play a single song as part of an ongoing experiment.  (See, e.g., Play at 5.)

The escape attempts also reveal important differences between the works.  The basic sequence of an employee developing a connection with a test-subject, deciding to free it, making a plan, and attempting the escape directly stem from the unprotectable basic plot premise of the employee deciding to free the test subject, and therefore that sequence is not protectable.  The protectable expression in the works differs most importantly in that the escape is successful in the Film but not in the Play.  In the Film, the escape serves as a springboard not only for the blossoming of Elisa's relationship with the creature but also to the Film's third act, in which Strickland hunts down the creature and confronts it, Elisa, and Giles on the dock.  The Play's dolphin, by contrast, never leaves the laboratory and never

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | | Date | July 23, 2018 |
|---|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | | |

becomes violent.  A hopeful reading of the Play suggests that the dolphin may avoid being killed, but it is not freed and it likely will be the subject of further testing.  Additionally, the Film's escape plan is hatched by Elisa, who enlists Giles and Zelda to assist her.  In the Play, Helen is persuaded by the dolphin to help it and follows the dolphin's instructions, and she lacks a true accomplice.  Danielle, a porter, helps Helen learn about the purpose behind the dolphin experiments, but she does not offer any assistance in, or even know about, the escape attempt before it fails.[4/]

Finally, the Film includes many storylines that the Play does not.  These include, for example, Strickland's increasing detachment from his family, Giles's unsuccessful attempts to sell his art, and his wooing of the waiter at the diner.  The Book includes additional scenes, character arcs, and backstories beyond those in the Film.  For example, the Book opens with Strickland's search for the godlike creature in the Amazonian jungle prior to the events of the Film (Book at 3-4, 7-9, 10-12, 15-17, 20-21, 23-27), and it goes into greater detail about Elisa's personal history, from her time at an orphanage where she grew up to her finding her apartment and her job at Occam (id. at 62-68).  These scenes further distinguish the Film and the Book from the Play.  See Funky Films, 462 F.3d at 1078 (noting that the plots of two works were different because the accused work "develops separate plot-lines around [characters] for whom there are no comparable characters in [the copyrighted work]").

In sum, despite some superficial similarities and some shared basic plot points, the stories told by the Film and the Book on the one hand and the Play on the other are different.  See, e.g., Benay, 607 F.3d at 625-26 (concluding that works told fundamentally different stories despite sharing the same premise and elements flowing naturally from that premise).

Setting

The Play takes place entirely within a laboratory and its adjoining rooms in New York City.  The Film takes place in various settings around Baltimore, which include, a large, secure government facility; multiple characters' homes; a cinema; a diner; another restaurant; and a remote location among sand dunes used by Russian operatives for secret meetings.  The Book includes even more locations, such as the Amazonian jungle and the office where Strickland's wife gets a job.  The presence in the Film and Book of these various settings that are not found in the Play further demonstrates that the works are different.  See Benay, 607 F.3d at 627-28 (noting that accused and allegedly infringed works each had

---

[4/]        Dan in the 1970 version of the Play was replaced with Danielle in the 1973 version.  Other than the change in gender, Dan and Danielle are not materially different.  The scene in which Dan, in the 1970 version, helps Helen is slightly different from the same scene in the 1973 version: Dan must hide to avoid being seen by Miss Moray after finding the scientists' files, but this is omitted from the 1973 version.  (Compare Freeman Decl. Ex. 2 at 5-6, and Strauss Decl. Ex. 1 at 5-6, with Play at 21.)  Other than adding an extra moment of suspense prior to the escape attempt, the difference does not change the Play.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

scenes in settings not found in the other and ultimately holding that works were not substantially similar); <u>Silas</u>, 201 F. Supp. 3d at 1176 (noting that accused work featured many locations while copyrighted work primarily took place in one location, and concluding that the works' settings did not support a finding of substantial similarity).

A laboratory setting flows naturally from the unprotectable premise of an employee at a scientific testing facility attempting to rescue a test subject. Thus, this similarity does not support a finding of substantial similarity. <u>See Benay</u>, 607 F.3d at 627-28. Regardless, the facilities in the two works are different. The Play's laboratory is found on a single floor of a New York City office building. Although the same entity apparently inhabits other floors as well, the laboratory with the dolphin is attended by only a handful of individuals. The facility and its experiments are not kept secret, as Danielle refers to magazine pictures of a prior dolphin that spoke. (Play at 11.) Nor is the facility unique, as it is said that over a thousand laboratories performed experiments on mice identical to experiments run at that facility. (<u>Id.</u> at 15.) By contrast, the Film's Occam is a vast and highly restricted government facility, guarded by armed military personnel. A team at Occam is analyzing a one-of-a-kind creature under the ultimate direction of General Hoyt, with Strickland supervising the day-to-day operations and the scientists performing tests.

The temporal setting of the works illustrates another difference. The Complaint alleges that the Play tells a story taking place "during the 1960s," "during the height of the Cold War" (Compl. ¶¶ 22, 43(A)), but that setting is not suggested in the Play itself. The Play was written during that time and therefore could be assumed to take place contemporaneously, but there are no references anchoring it to any specific point in time. By contrast, the Film's 1960s, Cold War-dependent setting is demonstrated by various cultural references and visual cues as well as the subplot involving the Russian spies.

<u>Themes</u>

The Play includes an explicit anti-animal experimentation message and an anti-war sentiment, and it urges people speak up against authority. The Film does not include either of those themes. Rather, the Film explores numerous different themes, not found in the Play, such as the power of friendship and love; the power of music and cinema as a form of expression and connection; unexpected soulmates; society's intolerance towards outsiders; racism; sexual identity and repression; bias against perceived outsiders and the banding of misfits; and toxic masculinity. Additional themes that Plaintiff asserts are common to both works actually appear only in one or the other. (<u>See</u> Opp'n to Film Defs.' Mot. at 21; Opp'n to Macmillan's Mot. at 19-20.) For example, only the Film implicates the power of love over hate, divisiveness and violence. Only the Play implicates the triumph of empathy and communication over fear and authority; the supremacy of individuality over conformity; real advancement is impossible without an open mind; our false view of "progress" neglects genuine progress of the human condition; and one must stand up against what is wrong, no matter one's station in life. The Court thus finds that the two works primarily explore different themes. Although both works to some extent include the theme that one must look beyond appearance and status to a person's

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

true character, that theme follows naturally from the works' shared basic premise and therefore does not show substantial similarity.  See Benay, 607 F.3d at 627.

### Pacing

The Play begins slowly but ramps up toward its end, as Helen tries to determine the purpose of the dolphin testing, agrees to help the dolphin, and then is discovered as she is attempting to lift the dolphin out of its tank.  The Play follows a single character, Helen.  The Film, on the other hand, tells multiple interlocking stories, and its pace alternates as it jumps between them.  The Film includes suspenseful scenes, such as when Elisa is nearly discovered visiting the creature during her break, as well as quieter scenes, such as scenes of Elisa and Giles at home.  As the Film builds up to the escape attempt, its pace quickens, cutting between numerous characters as the plan unfolds.  After the escape is successful, the Film slows.  The creature is kept at Elisa's apartment mostly without suspense until its planned release into the ocean, at which time the pace and suspense build again until the final confrontation with Strickland on the dock.  The works thus have different pacing.

### Mood

The Play presents its anti-animal experimentation message in a rather straightforward fashion.  The Play has a mild science fiction element in that the otherwise ordinary dolphin is able to speak, but the Play proceeds from this premise in a realistic manner.  By contrast, the Film tells a more fantastical story, involving a mythical and godlike, amphibious, humanoid creature and the loving and sexual relationship that it develops with Elisa.  Periods of joy and happiness, such as times that Elisa and Giles watch movies together, are contrasted with darker or suspenseful moments.  The Play does include sequences in which Helen imagines what it would be like if humans actually communicated and worked with dolphins (see Play at 23, 25-26); however, those scenes are direct depictions of the uses for dolphins that are suggested to Helen first by Miss Moray and then by what Helen reads in the scientists' experiment folder.  Those scenes lack the dreamlike quality of the Film's scenes in which Elisa is given over to fantasizing, such as when she imagines singing and dancing with the creature as if in an old movie.  Moreover, a dreamlike quality pervades much of the Film as whole, whereas the Play's mildly fantastical elements are confined to those two brief scenes.  The Court therefore finds that the works have different moods.

### Characters

"Seldom are characters in copyrighted works afforded their own copyright protection outside of the works they are found in, and those characters 'have displayed consistent, widely identifiable traits.'"  Gallagher, 2015 WL 12481504, at *7 (citation omitted) (quoting Rice v. Fox Broad. Co., 330 F.3d 1170, 1175 (9th Cir. 2003); and collecting cases).  Considered in a larger analysis of whether two works are substantially similar, the Court should discount similarities between characters that "are traits that flow naturally from the works' shared premises."  See Benay, 607 F.3d at 626 (citing  Olson v. Nat'l Broad.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

Co., 855 F.2d 1446, 1451-53 (9th Cir. 1988)).  Additionally, it is significant if "[t]here are a number of important characters in [each work] who have no obvious parallel in the other work."  See id. at 627.

      None of the Play's characters are sketched out beyond basic identifying traits, such as that Miss Moray is a strict supervisor or that Danielle is overly talkative.  Helen lacks any distinctive personality transcending the story that she inhabits, instead serving as the viewpoint for the Play's events and the mouthpiece for its messages.  Thus, none of the Play's characters are independently copyrightable. See Olson, 855 F.2d at 1452-53 (determining that characters were not independently copyrightable because they were not comparable to Mickey Mouse or Superman and were "depicted only by three-or four-line summaries in [a] treatment and screenplay, plus whatever insight into their characters may be derived from their dialogue and action").

      A comparison of the characters in the works further shows that the works are different.  Virtually all that the works' main characters have in common is that they are janitorial employees working the night shift at a scientific testing facility when they decide to attempt to free a test subject.  The Play's Helen is a relatively undeveloped character who speaks tersely and is presented as being simple.  She does not have any other people in her life (Play at 17), and she does not create any personal bond with any other character in the Play—including the dolphin.  Nor does Helen have any personal interests. (See id.)  Helen is spurred to action only at the dolphin's insistence.  At the end of the Play, Helen is unemployed and has developed a moral outrage about animal testing, but she otherwise is unchanged. The Film's Elisa, on the other hand, is lively and independent.  She is mute but communicates easily using sign language.  She has deep personal relationships with Giles and Zelda, and she develops a romantic and sexual relationship with the creature.  Elisa's love for the creature drives her to free it.  She then spurs her friends into action.  Elisa loves music and classic films, which she shares with the creature.  The Film also presents her backstory, which is further explored in the Book: she was an orphan and was discovered as an infant at the side of a river, bearing mysterious scars around her neck.  And the Film provides a twist at the end: Elisa is revived from her gunshot wounds by the creature and then becomes, or is revealed to always have been, a not-entirely-human amphibious creature herself.

      The test subjects in the two works also share virtually no similarities.  The Play's dolphin is an ordinary dolphin that can speak through its blowhole.  It has this ability prior to Helen meeting it. (See Play at 10.)  In the world of the Play, the dolphin is not unique in this ability; it is not the first dolphin that has been examined at the facility, and Helen is told that in the past other dolphins laughed or spoke. (Id. at 11.)  The dolphin does not form a personal connection with any character; when it speaks the word "love," it appears to be a general love among living creatures.  The dolphin never fights back against its captors.  By contrast, the Film's creature is a humanoid amphibious creature that enters into a loving and sexual relationship with Elisa.  The Film's creature learns to communicate when Elisa teaches it sign language.  The creature possesses godlike powers, which it uses to cure Elisa's and Giles's injuries and baldness.  The creature does fight back against its antagonists, severing two of Strickland's fingers and ultimately slashing his throat.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

      Other characters in each of the Play and the Film lack counterparts in the other work.  Plaintiff argues that the Play's Danielle, the porter, is the analogue of the Film's Zelda.  (Opp'n to Film Defs.' Mot. at 20; Opp'n to Macmillan's Mot. at 18.)  But Danielle is simply an overly talkative employee at the same facility who comes and goes and who lacks any real relationship with Helen.  Danielle offers some assistance to Helen by finding the scientists' experiment folder, but she does not know why Helen asks for it and does not become involved in Helen's attempt to save the dolphin.  The Film's Zelda not only works directly alongside Elisa but also is a close and loyal friend.  Zelda looks after Elisa and, after some initial reluctance, joins in Elisa's plan to smuggle the creature out of Occam.  Zelda also appears in multiple scenes without Elisa.  Danielle and Zelda thus lack any meaningful similarity.

      Plaintiff's suggestion that the Play's Miss Moray resembles the Film's Fleming and Strickland is even more strained.  (See Opp'n to Film Defs.' Mot. at 21; Opp'n to Macmillan's Mot. at 19; see also Compl. ¶ 43(J), (P).)  Miss Moray, the second most important human character in the Play, is Helen's direct supervisor, and her entire motivation is to keep the facility clean and orderly.  Fleming is a very minor character in the Film.  Although he is Elisa's supervisor, he does not constantly check in on her in the way that Miss Moray does with Helen.  Strickland, who oversees the creature's testing and is responsible to General Hoyt, does not directly supervise Elisa, and he is driven by his duties to Hoyt as well as his own anger.  The Play reveals nothing about Miss Moray outside of her work, while extended portions of the Film follow Strickland beyond his interactions with Elisa.  Strickland is given an entire story of his own, including allusions to a prior military career and a family that is shown onscreen.  More importantly, Strickland is the Film's villain, and his hostility to and search for the creature drives much of the Film's suspense.  Strickland is portrayed as evil, ruthless, and frightening, but the Play lacks a true villain.  None of the characters in the Play are malevolent; they are driven by benign motivations (e.g., maintaining order for Miss Moray, or furthering human knowledge for Dr. Crocus), and they appear at most indifferent to the dolphin.

      The Play also includes no analogue for Hoffstetler, the scientist and Russian spy who provides crucial assistance to Elisa's rescue plan.  Hoffstetler's position as a scientist does not make him the equivalent of the Play's Dr. Crocus, who is barely seen and is an ordinary scientist.  Hoffstetler is the main character of the Russian-spy subplot and serves as a foil to Strickland.  Dr. Crocus appears indifferent to the dolphin, while Hoffstetler is moved to help Elisa sneak the creature out of Occam rather than see it killed.  Nor is there any equivalent in the Play for Giles, Elisa's close friend and neighbor, who watches classic films with Elisa, assists in the escape plan, and has his own subplots involving his work and love life.  And the Film does not have any apparent counterpart for the Play's Fridge, an assistant to Dr. Crocus.  That the Play and Film include characters with no analogue in the other work further supports a finding that the works are not substantially similar.  See Benay, 607 F.3d at 627; Funky Films, 462 F.3d at 1079.

      The Book further develops the Film's characters, making the differences from the Play's characters even greater.  For example, the Book explores both Strickland's and Hoffstetler's backstories in more detail.  (See, e.g., Book at 3, 20, 124-25.)  The Book also provides additional development to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | | Date | July 23, 2018 |
|---|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | | |

Strickland's wife Lanie, who has no counterpart in the Play. Lanie has a minor role in the Film, but in the Book, she evolves from a dedicated stay-at-home mother to a working woman, and she ultimately takes her children and leaves Strickland. (Id. at 40-43, 48-49, 176-80, 278-82.)

In sum, none of the Play's characters are independently copyrightable, and the characters in the Play and the Film or Book share few, if any, similarities. See Olson, 855 F.2d at 1452-53.

<u>Dialogue</u>

"In order to support a claim of substantial similarity based on dialogue, 'extended similarity of dialogue' must be demonstrated." Gallagher, 2015 WL 12481504, at *7 (quoting Olson, 855 F.2d at 1450). "Ordinary words and phrases are not entitled to copyright protection, nor are 'phrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions.'" Bernal v. Paradigm Talent & Literary Agency, 788 F. Supp. 2d 1043, 1071 (C.D. Cal. 2010) (quoting Narell v. Freeman, 872 F.2d 907, 911-12 (9th Cir. 1989)).

Plaintiff identifies various pieces of dialogue from the Play and the Film that he contends are similar, asserting that they convey the same sentiment for the same purpose in the two works. (Opp'n to Film Defs.' Mot. at 23-24; Opp'n to Macmillan's Mot. at 21-22.) While the works have some common words, their use does not indicate substantial similarity because they are scattered and often used in different contexts. (See, e.g., Compl. ¶ 43(N) (alleging that Danielle and Zelda spoke similar dialogue because they both commented on their marriages); id. ¶ 43(DD) (alleging that Moray and Strickland spoke similar dialogue simply because they both used the word "worshipped").)

Nor are the other supposedly similar phrases cited by Plaintiff persuasive. When viewed in context, it is apparent that they express different sentiments for different purposes. For example, Plaintiff asserts that Helen's statement in the Play that "Some human beings are mute, you know. Just because they can't talk we don't kill them" is similar to Elisa's (signed) statement that "I move my mouth, like him, and I make no sound, like him. What does that make me?" (Opp'n to Film Defs.' Mot. at 23; see also Opp'n to Macmillan's Mot. at 22.) But Helen, speaking to Miss Moray, is questioning the facility's operations, while Elisa is pleading to Giles, trying to convince him to assist her in rescuing the creature. As another example, Plaintiff contends that Helen's statement in the Play that "You gotta talk back against what's wrong or you can't ever stop it. At least you gotta try" is similar to a conversation in the Film in which Elisa (again signing) says to Giles, "I can either save him now or let him die," and then in response to Giles's statement that the creature is not human, "If we don't do something . . . Neither are we." (Opp'n to Film Defs.' Mot. at 23; see also Opp'n to Macmillan's Mot. at 22.) Helen is condemning the facility's experiments, and in doing so she makes explicit the Play's theme of speaking out against authority to do what is right. By contrast, here again, Elisa is pleading with Giles to help her with the escape and is appealing to his humanity to move him to action. Other allegedly shared bits of dialogue, such as instructions to the main character to simply clean the facility (see Opp'n to Film Defs.' Mot. at 23; Opp'n to Macmillan's Mot. at 21), stem from the works' common

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

and unprotectable laboratory setting or premise of an employee developing an attachment to a test subject.

The Court thus concludes that the works do not share enough similar dialogue for this factor to support a finding of infringement.

<u>Overall Similarity</u>

Plaintiff alleges in his complaint 61 points of similarity between the Play and the Film. Many of these alleged similarities were considered and rejected. To the extent they have not been addressed previously, "the Ninth Circuit has held that a list of 'random similarities scattered throughout the works' is 'inherently subjective and unreliable.'" <u>Gallagher</u>, 2015 WL 12481504, at *14 (quoting <u>Litchfield v. Spielberg</u>, 736 F.2d 1352, 1356 (9th Cir. 1984)). Furthermore, Plaintiff's list of similarities includes many over-generalizations of the works, and it often mischaracterizes one or both works. For example, Plaintiff alleges that both works' main characters "bond[] with the creature [in the laboratory] by scrubbing the floor to the rhythm of . . . music [playing on a record player], singing along with the record, and exchanging playful glances with the creature, who watches her intently from inside the glass." (Compl. ¶ 43(HH).) Except for the singing (Elisa is mute), this is an accurate description of a scene from the Film, but the only comparable scene in the Play is very different: Helen begins to hum along to music played as part of a scientific experiment and she scrubs in rhythm to it because she is in good spirits, but the dolphin is blocked off by a curtain at that time. (Play at 13.) Plaintiff's list of scattered alleged similarities therefore is not persuasive. <u>See</u> <u>Gallagher</u>, 2015 WL 12481504, at *14 ("Even if the Ninth Circuit's prior holdings were unopposed to such lists, a cursory glance over the alleged similarities and the order in which they occur prove to the Court that [the plaintiff's] list is completely unreliable.").

Plaintiff also suggests that substantial similarity may be shown by the copying of a significant number of unprotectable elements in the Play. (Opp'n to Film Defs.' Mot. at 11, 16-17; Opp'n to Macmillan's Mot. at 6, 10-11.) It is true that "[c]opying a particular sequence of unprotectable elements can be considered infringement if there are a significant number of elements strung together." <u>DuckHole Inc. v. NBC Universal Media LLC</u>, No. CV 12-10077 BRO (Cwx), 2013 WL 5797279, at *7 (C.D. Cal. Sept. 6, 2013) (citing <u>Metcalf</u>, 294 F.3d at 1074). But, the Court finds that the Play and the Film actually do not share many similarities, protected or not. <u>See, e.g.</u>, <u>Bernal</u>, 788 F. Supp. 2d at 1068 (concluding that this rule did not apply and explaining: "The elements that Plaintiff contends are similar are, in fact, markedly different when viewed in context. Further, Plaintiff has not pointed to any common pattern of unprotected elements that occur in the same sequence in both works.").

The Court concludes that although there are some minor similarities, the Film and the Book are not substantially similar to the Play. Accordingly, Plaintiff's claims for direct copyright infringement fail.

JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 18-1435 PA (KSx) | Date | July 23, 2018 |
|---|---|---|---|
| Title | David Zindel v. Fox Searchlight Pictures, Inc., et al. | | |

### B.      Contributory and Vicarious Infringement

"It is well-established that '[s]econdary liability for copyright infringement does not exist in the absence of direct infringement . . . .'" UMG Recordings, Inc. v. Shelter Capital Partners LLC, 718 F.3d 1006, 1031 (9th Cir. 2013) (quoting A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 n.2 (9th Cir. 2001)).  Here, the Court has concluded that there is no direct infringement because neither the Film nor the Book is substantially similar to the Play.  As a result, Plaintiff's claims of secondary infringement based on the Film and the Book also must fail, and Plaintiff's second and third claims are dismissed.  See, e.g., Lawrence v. Sony Pictures Entm't, Inc., 534 F. App'x 651, 654 n.2 (9th Cir. 2013) ("Since Lawrence has failed to raise a material issue of fact with regard to direct copyright infringement of either the Video or the Book, she necessarily fails to establish contributory or vicarious copyright infringement." (citing A & M Records, 239 F.3d at 1013 n.2)).  The Court need not consider Macmillan's alternative arguments concerning these claims.

### C.      Leave to Amend

"Although there is a general rule that parties are allowed to amend their pleadings, it does not extend to cases in which any amendment would be an exercise in futility or where the amended complaint would also be subject to dismissal." Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1298 (9th Cir. 1998) (citation omitted); see Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008).  "[W]hen substantial similarity is absent after a review of the works at issue[,] no amendment could cure the complaint's deficiencies, thus, dismissal with prejudice is not uncommon." Gallagher, 2015 WL 12481504, at *2 (collecting cases); see Rentmeester, 883 F.3d at 1125.  Because the Court has concluded that as a matter of law that the Film and the Book are not substantially similar to the Play, leave to amend is not warranted.

### Conclusion

For all of the foregoing reasons, the Court grants Film Defendants' Motion to Dismiss the Complaint (Docket No. 29) and Macmillan's Motion to Dismiss Plaintiff's Complaint Against Defendant MacMillan Publishing Group, LLC (Docket No. 31).  This action is dismissed with prejudice.

IT IS SO ORDERED.